# <u>EXHIBIT A</u>

# LEASE AGREEMENT

THIS LEASE AGREEMENT (this "**Lease**") is made as of June 30, 2021 (the "**Effective Date**"), by and between 284 HEXAGON LLC, a Massachusetts limited liability company ("**Landlord**"), and SONDER HOSPITALITY USA INC., a Delaware corporation ("**Tenant**").

WHEREAS, Landlord is the fee owner of the Project (defined below), and Tenant and Landlord have agreed that Landlord shall lease to, and Tenant shall lease from Landlord, the Premises (defined below), which shall be licensed or subleased by Tenant to its guests for the Permitted Use (defined below), all pursuant to the terms, provisions and conditions more specifically set forth in this Lease.

NOW, THEREFORE, for and in consideration of the rent hereinafter reserved and the terms, covenants and obligations contained herein and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

## BASIC LEASE INFORMATION

The following is a summary of the basic Lease information ("**Basic Lease Information**"), which is incorporated into this Lease. The Basic Lease Information contains specific business terms, each of which shall be expanded upon in the Lease; however, if the terms set forth in this Lease conflict with the terms and definitions in the Basic Lease Information, then the Basic Lease Information shall prevail:

A. **Landlord's Notice Address**:
9401 Indian Creek Parkway, Ste. 800,
Overland Park, KS 66210
Attention: Sandra Edgerley

With a copy to:

Prince Lobel Tye LLP
One International Place, Suite 3700
Boston, MA 02110
Attention: Robert M. Schlein, Esq.

B. **Tenant's Notice Address**:
Sonder Hospitality USA Inc.

50 Terminal Street,
Charlestown, MA 02129
Attention: General Manager

With a copy to:

Sonder Hospitality USA Inc.

101 15th Street
San Francisco CA 94103
Attention: Office of the General Counsel

With a copy to:

Email: relegalnotices@sonder.com

C. **Building**:  The building that is part of the Project commonly known as  No. 284 located at 284 Commonwealth Avenue, Boston, MA.

D. **Premises**:  The entire interior of the Building, including all of the Rooms at the Project, consisting of 23 Rooms located on floors 1 to 4 and the rooftop level of the Building, the corridors in which the Rooms are located, along with any and all fixtures, improvements and personal property owned by Landlord and located thereon at any time during the Term, and all other spaces such as storage and office, all as depicted on **Exhibit A-2** attached hereto.

E. **Scheduled Delivery Date**:  August 30, 2021.

F. **Outside Delivery Date**: October 29, 2021 (sixty (60) days after the Scheduled Delivery Date).

G. **Commencement Date**:  The date that is the day after the expiration of the Onboarding Access Period.

H. **Estimated Commencement Date**: September 29, 2021.

I. **Expiration Date**:  The date that is the last day of the calendar month occurring five (5) years after the Commencement Date, subject to renewal as herein provided.

J. **Initial Term**:  Five (5) years.

K. **Renewal Term**:  One (1) five (5) year renewal term, subject to the terms of Section 2.2 below.

L. **Base Rent (Initial Term)**:  Initially $72,575.00 per month ($870,900.00 per annum), for Lease Year 2, $87,090.00 per month ($1,045,080.00 per annum) as may be adjusted as set forth in this Lease. Base Rent for the Initial Term is set forth on the Rent Roll attached hereto as **Exhibit B**.

M. **Rent Escalation Percent**: 20% for Lease Year 2, 6.5% for Lease Year 3, thereafter 2.5%, compounding annually.

N. **Rent Abatement Period**:  1.5 months of rent abatement for the Initial Term commencing on the Commencement Date.

O. **Surety Bond Amount**:   $145,150.00 which is equal to two (2) months of Base Rent (calculated as of the Commencement Date (defined below)).

P. **Onboarding Access Period**:  Thirty (30) day period following the date Landlord delivers the Premises to Tenant with all of the Delivery Conditions satisfied.

Whenever used in this Lease, all defined words and phrases, unless the context otherwise requires, shall have the meanings assigned to each as set forth and described in this Lease (including, without limitation, Appendix A attached hereto).

## LEASE

### Article 1.          PREMISES; DELIVERY CONDITION

1.1      Premises.  Subject to all of the terms and conditions hereinafter set forth, Landlord hereby demises and leases to Tenant, and Tenant hereby rents and hires from Landlord, the Premises.  Subject to the terms and conditions of this Lease and applicable Laws, Tenant and Authorized Parties shall have access to and use of the Premises 24 hours per day, 7 days per week.

1.2      Landlord's Work.  Landlord shall, at its sole cost and expense and in accordance with all applicable Laws, complete the work described in **Exhibit C** attached hereto and made a part hereof on or prior to the Scheduled Delivery Date.

### Article 2.          TERM; ONBOARDING ACCESS PERIOD

2.1      Term.  The Initial Term shall commence on the Commencement Date and end on the Expiration Date, unless extended or earlier terminated as provided herein.  At least ten (10) days prior to the Commencement Date, Landlord and Tenant shall agree on the Commencement Date, Rent Commencement Date and the Expiration Date in a certificate in the form attached hereto as **Exhibit D** (the "**Commencement Date Certificate**"), provided, however, that failure to execute and deliver the Commencement Date Certificate shall not affect the Commencement Date, the Rent Commencement Date or the Expiration Date, and provided further that, if Landlord fails to deliver the Premises in accordance with the terms of this Lease, such that the anticipated Commencement Date, anticipated Rent Commencement Date and anticipated Expiration Date are incorrect, the Commencement Date Certificate shall be amended to reflect the correct Commencement Date, Rent Commencement Date and Expiration Date.  Landlord shall deliver the Premises to Tenant with all of the Delivery Conditions satisfied on or before the Scheduled Delivery Date subject and pursuant to the terms and conditions set forth in **Exhibit C** attached hereto.  If Landlord fails to deliver the Premises in the Delivery Condition to Tenant within thirty (30) days after the Scheduled Delivery Date for any reason (subject to any delays actually caused by a Force Majeure Event and/or a Tenant Delay), Tenant shall receive abatement of Rent in an amount equal to one (1) day of Base Rent for each day that the delivery of the Premises in the Delivery Condition occurs after the date that is thirty (30) days from the Scheduled Delivery Date, and such abatement shall apply immediately following the Commencement Date

(and the Rent Abatement Period shall be tolled until any abatement provided under this Section 2.1 has been applied in full, so that Tenant shall have the full benefit of the Rent abatement set forth in this Section 2.1 and the Rent Abatement Period).  In the event Landlord fails to deliver the Premises to Tenant in the Delivery Condition on or before the Outside Delivery Date (subject to any delays actually caused by a Force Majeure Event and/or a Tenant Delay), Tenant shall have the right to terminate this Lease upon no less than thirty (30) days' advance Termination Notice to Landlord without payment of any termination fee, penalty or damages to Landlord, provided, however, if Landlord delivers the Premises to Tenant in the Delivery Condition prior to the termination date set forth in the Termination Notice, then such termination notice shall be deemed null and void, and this Lease shall continue in full force and effect.  If Tenant terminates this Lease pursuant to this Section 2.1, this Lease shall be void and of no further force or effect, and neither party shall have any further obligations under this Lease.  As used in this Section 2.1, "**Tenant Delay**" shall mean a delay in Landlord's delivery of the Premises in the Delivery Condition directly caused by the negligence or willful misconduct of Tenant or any employee, agent, contractor, or invitee of Tenant.  For purposes of this Section 2.1, a Force Majeure Event shall only extend the Scheduled Construction Commencement Date if Landlord notifies Tenant of any Force Majeure Event actually affecting Landlord's delivery of the Premises in the Delivery Condition within ten (10) days after the occurrence of such Force Majeure Event, and a Tenant Delay shall only extend such dates if Tenant fails to cure any event causing such delay within forty-eight (48) hours following receipt of Landlord's written notice thereof.

2.2     Renewal Term.  Either Tenant or Landlord may request that the other party agree to an extension of the Initial Term through the Renewal Term, which request (a "**Renewal Term Request**") shall be in writing and delivered to the other party not later than nine (9) months, nor earlier than twelve (12) months, prior to the expiration of the Initial Term of this Lease, time being of the essence thereof.  If the party receiving the Renewal Term Request does so agree, in writing delivered to the requesting party within thirty (30) days following the date of the Renewal Term Request, then the Term of this Lease shall be automatically extended through the Renewal Term, without the requirement of any further instrument, upon all of the same terms, provisions and conditions set forth in this Lease, except that Base Rent payable during the Renewal Term shall be adjusted based on the Prevailing Market Rate at the time of renewal.

2.3     Visual Inspection; Onboarding Access Period.      From and after the Effective Date and until the Commencement Date, Tenant shall have the right to enter the Premises for the purposes of conducting visual inspections, creating digital floor plans, and taking photographs and videos.  On or before the Effective Date, Landlord shall deliver to Tenant a true, correct and complete set of Building plans, including, without limitation, plans for architectural, structural, mechanical, electrical, plumbing, fire sprinkler and fire alarm systems of the Building to the extent the same are in Landlord's possession.  Commencing on the Delivery Date and continuing for the Onboarding Access Period, Tenant may perform the Onboarding Work.  During the Onboarding Access Period, Landlord shall, at no additional cost to Tenant, make available to Tenant the elevator at the Building for Tenant's use, on an exclusive basis, at all times (including after business hours).  The Onboarding Access Period shall be extended on a day-for-day basis for any delays actually caused by Landlord and/or Landlord Parties or to the extent the elevator becomes unavailable for Tenant's use for more than four (4) hours a day during normal business hours during the Onboarding Access Period.

2.4     Punchlist Items.  At least ten (10) days prior to the commencement of the Onboarding Access Period,  Landlord and Tenant shall together conduct a walk-through and identify any outstanding Punchlist Items on a punchlist (the "**Punchlist**").  The date of such walk-through shall be referred to herein as the "**Punchlist Commencement Date**."  Landlord shall use commercially reasonable efforts to diligently and expeditiously cause all of the Punchlist Items identified on the Punchlist to be completed to the reasonable satisfaction of Tenant prior to the expiration of the Onboarding Access Period.  In the event there are any minor Punchlist Items remaining in the Premises that do not interfere with Tenant's Onboarding Work as of the Scheduled Delivery Date, Tenant shall send the list of such minor Punchlist Items to Landlord on or prior to the Scheduled Delivery Date, and Landlord shall diligently complete such minor Punchlist Items during the Onboarding Access Period.

## Article 3.        RENT; TAXES; SURETY BOND

3.1     Rent.  Commencing on the Rent Commencement Date, Tenant shall pay Landlord the Base Rent, without notice, deduction or offset, except  to the extent otherwise expressly provided in this Lease, in lawful money of the United States of America, by ACH transfer, pursuant to the deposit information provided by Landlord to Tenant in accordance with this Section 3.1.  Landlord acknowledges and agrees that following Landlord's receipt of a written request therefor from Tenant which is received at least forty-five (45) days prior to the Rent Commencement Date, Landlord shall complete Tenant's New Landlord Set Up Form electronically at least thirty (30) days prior to the Rent Commencement Date, and that the first payment of Rent shall not be considered late if Landlord does not timely and accurately complete such form, or provide Tenant complete and accurate deposit information, at least thirty (30) days prior to the Rent Commencement Date.  Base Rent shall be paid in equal monthly installments, in advance, on the first business day of each calendar month during the Term.  If the Rent Commencement Date is not the first day of a month, the Base Rent for the month in which the Rent Commencement Date occurs shall be prorated according to the number of days remaining in that month.  For the Initial Term, on the commencement of the second (2nd) Lease Year and each anniversary thereafter, annual Base Rent shall increase by the applicable Rent Escalation Percent as set forth on **Exhibit B** attached hereto.

Commencing on the Rent Commencement Date, Tenant shall pay to Landlord, concurrently with its payment of Base Rent, additional rent in the amount of $920.83 per month (the "**Additional Rent**") ending on the Expiration Date of the Lease for the Initial Term; provided however that Tenant shall have the right to pay the Additional Rent in the Full Payment Amount remaining at the time of such payment as set forth in **Exhibit I** at any time without penalty and such payment shall satisfy Tenant's obligation to pay Additional Rent for the remainder of the Term and no additional installment of Additional Rent shall be due thereafter.

3.2     Renewal Rent.  In the event the Initial Term is renewed by the parties pursuant to Section 2.2. above, either party shall have the right, by providing written notice to the other party no later than sixty (60) days prior to the expiration of the Initial Term (a "**Rent Adjustment Date**"), to adjust the Base Rent based on the Prevailing Market Rate at the time of renewal (a "**Rent Adjustment Notice**").  If either party sends a Rent Adjustment Notice to the other party, then Landlord and Tenant shall use diligent and good faith efforts to agree upon the

Base Rent for the Renewal Term within thirty (30) days following the date of the Rent Adjustment Notice. If the parties are unable to agree at the end of such 30-day period, then the exercise of the Renewal Option shall be deemed null and void, and this Lease shall terminate at the end of the current Term. Base Rent for the Renewal Term shall not be less than Base Rent for the last year of the Initial Term.

      3.3    <u>Delinquent Rent</u>.    If any installment of Rent is delinquent, and Tenant fails to cure such delinquency within ten (10) business days after Tenant's receipt of written notice thereof from Landlord, then such delinquent Rent amount shall bear interest commencing on the eleventh (11th) business day after Tenant's receipt of such written notice from Landlord until paid at a rate equal to the lesser of (a) 5% per annum, or (b) the maximum rate allowed by applicable Laws. Landlord's acceptance of any interest payment shall not constitute a waiver or relinquishment of any of the other rights or remedies of Landlord.

      3.4    <u>Taxes</u>. Landlord shall pay, at its sole cost and expense, all real property taxes and assessments on the Project. Tenant shall pay all personal property taxes for personal property located on the Project or used in connection with the operation, maintenance and repair of the Project. In either case, such party shall also pay any costs and fees incurred in connection with seeking reductions in any such tax liabilities such as any costs incurred by Landlord for compliance, review and appeal of such tax liabilities. From and after the Commencement Date, Tenant shall pay all business taxes, transient occupancy tax (TOT) licenses, and fees levied or imposed by the Governmental Authority upon Tenant's business operations and activities at the Premises, including, without limitation, taxes and fees related to the operation of the Permitted Use. For the avoidance of doubt, Tenant shall not be responsible for any franchise, transfer, gains, inheritance, estate, gift, financing, mortgage recording and/or income taxes imposed on Landlord.

      3.5    <u>Surety Bond</u>. On or before the Commencement Date, Tenant shall deliver to Landlord the Bond in the form substantially similar to **<u>Exhibit H</u>** in the Surety Bond Amount which shall secure Tenant's payment obligations hereunder. During the continuation of an Event of Default (as defined below), Landlord may, but shall not be obligated to, make a claim against the Bond for recovery of any accrued unpaid lease payment obligations of Tenant. If there is no uncured Event of Default by Tenant, the Bond shall be cancelled by the Bond provider thirty (30) days after the Expiration Date or the Termination Date (as applicable). For the avoidance of doubt, Landlord acknowledges that a Bond will not cover any recovery associated with liquidated damages or acceleration of any payments that may exist under the terms of this Lease.

      3.6    <u>Rent Relief.</u> During the Initial Term, Tenant shall have the right to elect to receive a one-time rent abatement in the amount equal to one (1) month of then-current Base Rent in the event of a Recession (as hereinafter defined). Following a Recession, the next two (2) scheduled increase in Base Rent by the Rent Escalation Percent shall not occur. "**Recession**" shall mean either (a) two (2) consecutive quarters of negative Real Gross Domestic Product growth in either (i) the United States, or (ii) Massachusetts (as initially reported by the US Federal Reserve System, US Bureau of Economic Analysis or other official government source, disregarding any later revisions), or (b) average RevPAR over a three (3) month period for Upper Upscale hotels (as reported by the Smith Travel Accommodations Report) in the city in which the Project is located declines by 7.5% or more year over year for the same three (3) month period.

3.7 <u>Landlord's FF&E</u>. Commencing on the Commencement Date, Tenant shall have the right to utilize Landlord's FF&E, free of charge, during the Term. Tenant shall have the right to remove, replace and dispose of any such Landlord's FF&E in its sole discretion during the Term, and any such Landlord's FF&E replaced or disposed of by Tenant shall be automatically removed from the definition of "Landlord's FF&E" in this Lease. In the event any Landlord's FF&E is no longer needed in the Premises, Tenant shall notify Landlord thereof, and Landlord shall have the option to collect such Landlord's FF&E from Tenant's warehouse within fourteen (14) days following Landlord's receipt of such notice. Landlord shall not remove Landlord's FF&E during the Term. On the Expiration Date or the Termination Date, as applicable, Tenant shall return Landlord's FF&E remaining in the Premises to Landlord in their as-is condition. For the avoidance of doubt, Tenant shall have the right at any time and from time to time to replace items of Landlord's FF&E at Tenant's sole cost, which replacement items shall be considered Tenant's Property and the sole property of Tenant, but shall become the property of Landlord and returned as part of Landlord's FF&E on the Expiration Date or Termination Date, as applicable, as provided in this Section 3.7. During the Onboarding Access Period, Tenant shall have the right to confirm the list of Landlord's FF&E attached hereto as **Exhibit F** is correct and complete. In the event Tenant discovers any discrepancies between Landlord's FF&E located on the Premises and **Exhibit F**, Landlord and Tenant shall update **Exhibit F** as necessary to ensure **Exhibit F** is the correct and complete list of all FF&E located on the Premises on or before the Commencement Date, provided, however, Landlord shall ensure every FF&E item listed on **Exhibit F** as of the Effective Date remains in the Premises as of the Commencement Date unless Tenant agrees otherwise.

## Article 4. USE; PERMITTED USE APPROVAL; BUSINESS LICENSE

4.1 <u>Use</u>. Tenant shall use the Premises only for the Permitted Use.

4.2 <u>Permitted Use Approval</u>. Landlord agrees that it will maintain in effect at all times during the Term all Permitted Use Approvals and will not take any action to modify any Permitted Use Approval in any manner that might jeopardize or result in the suspension, expiration, or termination of any Permitted Use Approval. In the event that the Permitted Use Approval in effect is revoked, terminated or suspended through no fault of Tenant, and Tenant is unable to legally operate in the Premises for the Permitted Use, then, notwithstanding any contrary provision contained herein, Base Rent shall abate from the date of suspension, revocation, expiration or termination thereof on a per diem basis until such Permitted Use Approval is obtained or renewed. If the Permitted Use Approval is not obtained or renewed within ninety (90) days following the suspension, expiration, revocation or termination thereof, Tenant shall have the right to terminate this Lease at any time thereafter by delivering written notice to Landlord. Upon the effectiveness of such termination, this Lease shall be cancelled and of no further force or effect, and neither party shall have any further obligations under this Lease arising from and after the effective date of such termination, and any other obligations which expressly survive the termination of this Lease.

4.3 <u>Business License</u>. Prior to Tenant commencing operations in the Premises, Tenant shall, at Tenant's sole cost and expense, commence and exercise diligent efforts to obtain any Business License. Landlord shall fully cooperate with Tenant as reasonably

necessary to obtain the Business License. Once obtained, each of Tenant and Landlord agrees it shall not commit any act or omission which would jeopardize or result in the suspension, expiration, revocation or termination of the Business License and Tenant agrees to comply with the requirements of the Business License so long as it operates the Premises. Notwithstanding anything herein to the contrary, Tenant's obligations under this Lease are contingent upon Tenant obtaining the Business License in form and substance reasonably acceptable to Tenant, and Tenant shall have the right to terminate this Lease by providing written notice to Landlord (without any payment of penalty, damages or termination fee to Landlord) if the Business License is not obtained on or before the Commencement Date due to Landlord's act or omission. Upon delivery of such termination notice, this Lease shall be cancelled and of no further force or effect, and neither party shall have any further obligations under this Lease, except for the obligations which expressly survive the termination of this Lease. In addition, once Tenant has obtained the Business License, in the event that (a) the Business License is either suspended or permanently revoked; (b) such Business License is required in order for Tenant to operate the Permitted Use at the Premises; and (c) such suspension or revocation is not caused by any negligence or willful misconduct of Tenant, then, notwithstanding any contrary provision contained herein, Base Rent shall abate from the date of such suspension or revocation until such Business License is reinstated or obtained again. Tenant shall give Landlord notice of its receipt of any notice of violation of the Business License or any proceeding to suspend or revoke the Business License. Landlord shall have the right, but not the obligation, during ninety (90) days following such notice, to attempt to cure such violation or reinstate or obtain the suspended or revoked Business License at Tenant's expense (but at Landlord's expense if the violation or any proceeding to suspend or revoke the Business License is caused by Landlord), and if Landlord elects to do so, Tenant shall cooperate with Landlord in connection with Landlord's effort to cure such violation or reinstate or obtain the Business License. If the Business License is not reinstated or obtained again within ninety (90) days following Tenant's notice to Landlord, or if Landlord or Tenant has received notice within such ninety (90) day period that the Business License will not be reinstated, Tenant shall have the right to terminate this Lease at any time thereafter by delivering written notice to Landlord, and this Lease shall be cancelled and of no further force or effect and neither party shall have any further obligations under this Lease, except for the obligations which expressly survive the termination of this Lease.

<div align="center">

**Article 5.      TENANT'S WORK**

</div>

5.1    <u>Landlord's Consent</u>. Except as may be expressly provided in this Lease, Tenant shall not perform any Tenant's Work without Landlord's consent (which consent shall not be unreasonably withheld, conditioned, or delayed) except (i) to the extent that such Tenant's Work is a refurbishment or replacement of existing improvements with the equipment, fixtures, wall coverings, flooring, paint, tiles, finishes, doors, shelving, vanities, cabinetry, countertops, sinks, bathroom fixtures, light fixtures, and appliances that are substantially similar in look, feel and quality, provided that Tenant shall give Landlord notice (which may be by email) of such Tenant's Work promptly thereafter, and (ii) initial Tenant's Work as described in **<u>Exhibit C-2</u>** attached hereto which Tenant may perform prior to the Commencement Date at Tenant's sole cost and expense. All Tenant's Work shall be performed, at Tenant's sole cost and expense, in a good and workmanlike manner and in compliance with this Lease and applicable Laws. At Landlord's election, Tenant's Work shall not be removed and shall, on the Expiration Date or Termination

Date, as applicable, become the property of Landlord.  Notwithstanding anything to the contrary contained herein, if Tenant's written request for consent of Tenant's Work includes a request for Landlord to determine whether Landlord requires Tenant to remove such Tenant's Work upon expiration or earlier termination of the Term, Landlord's response shall indicate whether Landlord will require Tenant to remove such Tenant's Work upon expiration or earlier termination of the Term.   For the avoidance of doubt, Landlord's prior consent (which consent shall not be unreasonably withheld, conditioned, or delayed) shall be required for Tenant's Work performed by Tenant to correct the deficiencies identified in that certain Limited Accessibility Compliance Review (Project Number 21-313760.2), dated April 9, 2021, prepared by Partner Engineering and Science, Inc., other than the deficiency described in **Exhibit C** attached hereto, which shall be corrected by Landlord as provided therein, and the width of the route between the coffee area and the library of the Premises (collectively, the "**Deficiencies**").   During the Onboarding Access Period and during the Term, Tenant may, subject to Landlord consent as provided above, perform the work necessary to correct the Deficiencies, which Tenant elects to correct at its sole discretion, and to the extent Tenant corrects the Deficiencies, Landlord hereby agrees to reimburse Tenant for such work up to the amount of Five Thousand Dollars ($5,000.00), which costs shall be paid by Landlord to Tenant within ten (10) business days following Landlord's receipt of an invoice evidencing the cost of such work to correct the Deficiencies from Tenant.  For the avoidance of doubt, Landlord shall indemnify Tenant against all Losses arising out of the Deficiencies that is not cured.

      5.2     Landlord's Review and Approval.  Prior to performing any Tenant's Work which requires Landlord's consent pursuant to this Article 5, Tenant shall (a) deliver to Landlord copies of Tenant's Plans, (b) obtain any required authorizations and/or Permits from the Governmental Authority for Tenant's Work, and (c) deliver to Landlord certificates (in commercially reasonable and customary form) of (i) worker's compensation insurance covering all persons to be employed by Tenant for the performance of Tenant's Work, and all contractors and subcontractors performing any Tenant's Work, and (ii) commercial general liability insurance, including Landlord as an additional insured.  Within ten (10) days following Landlord's receipt of the proposed Tenant's Plans, Landlord shall review and approve (which approval shall not be unreasonably withheld, conditioned or delayed) or disapprove the proposed Tenant's Plans, provided that such disapproval shall state, in reasonable detail, the basis therefor.  If Landlord disapproves of Tenant's Plans, Tenant shall make such changes as are reasonably necessary and shall resubmit the same to Landlord for approval, and Landlord shall have five (5) days from receipt of any revised Tenant's Plans to approve or disapprove the same in the same manner, and such procedure shall continue until Tenant's Plans are approved.  In the event Landlord does not respond to Tenant's submission within the aforementioned time periods, Tenant shall send Landlord a second request for approval containing the following language in bold print: "THIS IS A  SECOND  REQUEST  FOR  APPROVAL  OF  THE  PROPOSED  PLANS  AND SPECIFICATIONS. IF LANDLORD DOES NOT RESPOND TO THIS REQUEST WITHIN THREE (3) BUSINESS DAYS, LANDLORD'S APPROVAL SHALL BE DEEMED GRANTED PURSUANT TO THE PROVISIONS OF THE LEASE." If Landlord shall again fail to respond within such three (3) business days after receipt of such second request, Landlord's approval of such Tenant's Plans shall be deemed granted.  At Tenant's request, Landlord shall join in applications for any authorizations and/or Permits required by any Governmental Authority in

connection with Tenant's Work (to which Landlord has consented, if such consent is required pursuant to this Article 5), and otherwise cooperate with Tenant in connection with Tenant's Work.

      5.3   <u>Mechanic's Lien</u>.  If, as a result of Tenant's Work, a mechanic's lien is filed against any part of the Premises or Tenant's Work, and no action of Landlord caused the creation of such lien, then Tenant shall, at Tenant's expense, cause it to be released (by bond or otherwise) within thirty (30) days after Tenant receives notice of the filing thereof.

      5.4   <u>Roof</u>.  Tenant shall have the right to place on the roof or other portions of the Building one or more satellite dishes, antennas, security cameras or other similar devices and to replace and repair any such device(s), for the purpose of receiving and sending radio, internet, television, computer, telephone, or other communication signals, and for safety and security purposes, provided, however, that (a) such installation(s) shall be installed and maintained by Tenant at Tenant's sole expense, (b) Tenant shall first obtain Landlord's consent to such installation(s) (which consent shall not be unreasonably withheld, conditioned, or delayed), and (c) such installation(s) shall be made only subject to and in compliance with applicable Laws.

## Article 6.      SERVICES; UTILITIES

      6.1   <u>Services</u>.  Landlord shall, at its sole cost and expense, provide to the Building those services designated as "Landlord" (collectively, the "**Landlord's Services**") on the Schedule of Services attached hereto as **<u>Exhibit G</u>** in compliance with applicable Laws, requirements and recommendations of regulatory and other like bodies or of insurers, industry practice, and ethical standards.  Landlord shall cooperate with Tenant to allow Tenant to provide reasonable security to its guests, including security camera systems, additional locks and physical security.  To the extent any third party contractors are hired by Landlord to provide any of the Landlord's Services, all such service contracts between the contractors and Landlord shall provide that (a) the contractors thereunder will carry general liability insurance to a commercially reasonable and industry standard limit, and Tenant shall be added as an additional insured to the contractor's liability policies; (b) the contractors shall provide a copy of their insurance to Tenant before entering the Premises; and (c) the contractors will indemnify Tenant to the same extent Landlord is indemnified under the service contracts.  Tenant shall have the right to request and review copies of the applicable service contracts to verify the foregoing.  In consideration for Landlord's provision of the Landlord's Services, commencing on the Rent Commencement Date, as additional Rent, Tenant shall pay Landlord $60,000.00 every year (which amount shall increase on each anniversary of the Commencement Date by 4%) in twelve (12) equal installments concurrently with its payment of the Base Rent.  In addition, Tenant shall, at its sole cost and expense, provide those services designated as "Tenant" on the Schedule of Services attached hereto as **<u>Exhibit G</u>** in a manner that is at least on par with such services provided at Upper Upscale hotels in Boston and in compliance with applicable Laws, requirements and recommendations of regulatory and other like bodies or of insurers, industry practice, and ethical standards.

      6.2   <u>Service Interruption</u>.  In the event Tenant reasonably determines that the Premises or any portion thereof is unsuitable for operation of its business due to a Service Interruption and as a result, Tenant ceases the operation of its business at the Premises or any portion thereof for two (2) business days or longer following Tenant's notice of such Service

Interruption to Landlord, then for each day following the expiration of such two (2) business day period during which the Service Interruption continues, Tenant shall be entitled to receive an abatement of Base Rent in proportion to the Premises so affected for the duration of the Service Interruption until such Service Interruption is fully remedied by Landlord. Subject to Article 11 below, in the event there is a material reduction of any access to the Premises, then Tenant shall be entitled to receive an abatement of Base Rent in proportion to the Premises so affected for the duration of such reduction until the access is fully remedied by Landlord. In the event Landlord fails to commence to cure a Service Interruption within forty-eight (48) hours after Landlord's receipt of Tenant's notice thereof and/or fails to diligently pursue the cure of the Service Interruption to completion, Tenant may, at its option, carry out the cure of such Service Interruption and deduct all reasonable and actual expenses incurred by Tenant in performing such cure. The provisions of this paragraph, if elected by Tenant, shall be Tenant's sole remedy for failure of Landlord to promptly cure the Service Interruption at issue.

      6.3    <u>Utilities and Infrastructure</u>. Landlord shall provide throughout the Term the following utility connections and infrastructure to the Project (collectively, "**Utilities**"): hot and cold water, electricity, municipal gas, wastewater system for both sewage and stormwater, adequate Building Systems (including comfortable levels of heating, ventilation, and air conditioning to the Premises), Building-wide high-speed optic internet, telephone cable and TV cable.

      6.4    <u>Utility Cost</u>. Tenant shall pay directly to applicable utility providers, the cost of all the Utilities used in the Premises and which are supplied and metered to the Premises.

      6.5    <u>Utilities Interruption</u>. In the event of Tenant reasonably determines that the Premises or any portion thereof is unsuitable for operation of its business due to an Utilities Interruption (not caused by the negligence or willful misconduct of a Tenant Party) and as a result of such Utilities Interruption, Tenant ceases the operation of its business at the Premises or any portion thereof for two (2) business days or longer following Tenant's delivery to Landlord of a notice of an Utilities Interruption, then Tenant shall be entitled to receive an abatement of Base Rent in proportion to the Premises so affected from the end of such two (2) business day period until such Utilities Interruption is fully remedied. The provisions of this paragraph, if elected by Tenant, shall be Tenant's sole remedy for failure of Landlord to promptly cure the Utilities Interruption at issue.

### Article 7.      REPAIRS, MAINTENANCE, REPLACEMENT

      7.1    <u>Landlord's Repairs</u>. Landlord shall, at its sole cost and expense, be responsible for and shall repair and maintain (including preventative maintenance) in safe and good working order, and replace, and in a first class manner and in compliance with applicable Laws, requirements and recommendations of regulatory and other like bodies or of insurers, industry practice, and ethical standards, all components of the Project, structural or otherwise, interior or exterior, that are not otherwise Tenant's obligation under Section 7.4 below (collectively, "**Landlord's Repairs**"), including, without limitation, foundations, building shell, roof, slab, basement, building exterior, exterior windows, curtain walls, structural elements of the Building, appliances, , and all Building Systems. Except in connection with Landlord's Repairs, Landlord shall not construct or alter any portion of the Premises on or after the Commencement Date without

Tenant's prior written consent.  Landlord shall also be responsible for repairing any latent defects in the Premises that are discovered during the Term and for making any repairs and/or replacements to the Premises that Tenant is responsible for under Section 7.4 below to the extent the need for same is caused by the negligence or willful misconduct of Landlord or its agents, representatives, employees or contractors.  Landlord shall perform such repair, maintenance or replacement work (a) using best efforts to prevent and/or minimize interference with the conduct of Tenant's business in the Premises and to prevent any damage to the Premises, Tenant's Work, and Tenant's Property (all of which shall promptly be repaired by Landlord if damaged by Landlord or Landlord Parties, at Landlord's sole cost and expense), and (b) in compliance with Article 14 below.

      7.2    <u>Failure to Make a Landlord's Repair</u>.  If a need for a Landlord's Repair arises, Tenant shall notify Landlord after Tenant obtains actual knowledge thereof.  Landlord shall promptly commence a Landlord's Repair and diligently pursue such Landlord's Repair to completion.  In the event Landlord fails to commence the Landlord's Repair required to remedy such maintenance or repair failure within two (2) business days after Landlord's receipt of Tenant's notice thereof and/or thereafter fails to diligently pursue any such Landlord's Repair to completion, Tenant may, at its option, carry out such Landlord's Repair and deduct all reasonable and actual expenses incurred by Tenant in performing such repair plus a ten percent (10%) overhead charge from the future Rent payment coming due.  Alternatively, in the event Landlord fails to commence a Landlord's Repair within forty-eight (48) hours after Landlord's receipt of Tenant's notice thereof and/or fails to complete such Landlord's Repair within five (5) days after such receipt, and the Premises or any portion thereof is unsuitable for operation of its business, and as a result thereof, Tenant does not operate the Premises or the applicable portion thereof, then Tenant shall be entitled to receive an abatement of Base Rent in the amount equal to 100% of the Base Rent from the expiration of such five (5) day period. However, in the event Landlord's failure to complete such Landlord's Repair within the five (5) day period is caused by a Force Majeure Event, provided Landlord commences such Landlord's Repair within forty-eight (48) hours after Landlord's receipt of Tenant's notice thereof and uses diligent efforts to complete the same, Tenant shall, instead, at the election of Tenant, exercised by notice to Landlord, be entitled to receive an abatement of Base Rent in the amount equal to: (i) 50% of the Base Rent from the expiration of such five (5) days period up to fifteen (15) days after the expiration of such five (5) day period, if such delay continues for up to fifteen (15) days after the expiration of such five (5) days period, and (ii) 100% of the Base Rent from the expiration of such fifteen (15) days period, if such delay continues in excess of such fifteen (15) day period, in all events in proportion to the area of the Premises so affected and Tenant does not operate the Premises or the applicable portion thereof until Landlord's Repair is completed, which caused the cessation of Tenant's operation of its business in such affected portion of the Premises.  The provisions of this paragraph, if elected by Tenant, shall be Tenant's sole remedy for failure of Landlord to promptly complete the Landlord's Repair at issue.

      7.3    <u>Urgent Landlord's Repairs</u>. In the event of an urgent Landlord's Repair (reasonably determined by Tenant) that materially prevents Tenant from conducting its business in the Premises, Tenant may carry out such Landlord's Repair and deduct all reasonable and actual expenses incurred by Tenant to carry out such Landlord's Repair. In the event Tenant performs any such urgent Landlord Repairs or elects to exercise self-help under this Lease, Tenant shall use

commercially reasonable efforts to contract necessary repairs using the Approved Vendor List which shall be provided by Landlord and be attached hereto as **Exhibit K** on or prior to the Commencement Date.

7.4    <u>Tenant's Repairs</u>.  Tenant shall, at its sole cost and expense, maintain and repair in good condition (subject to normal wear and tear attributable to typical guesthouse use) (a) casework, window treatments, furniture, furnishings and accessories installed by Tenant, except to the extent any damage is caused by the negligence or willful misconduct of Landlord or Landlord Parties (which shall be a Landlord's Repair), and (b) any damage caused by the negligence or willful misconduct of Tenant or Tenant Parties.  In addition, Tenant or its employees may perform minor and common domestic repair work in the Premises that does not require any material trade skills or technical knowledge such as general upkeep of furniture and fixtures, drain maintenance, and spot cleaning of walls, carpet and upholstery.

### Article 8.        COMPLIANCE WITH LAWS

8.1    <u>Legal Compliance</u>.  Landlord covenants, represents and warrants to Tenant that the Premises and the Project is in compliance with all applicable Laws, including, but not limited to, all applicable zoning laws, building codes, ordinances, statutes, and the ADA (for transient/guesthouse use) and other similar federal, state and local Laws and regulations as of the Commencement Date.  Landlord covenants, represents and warrants to Tenant that the Premises includes one (1) ADA mobility accessible Room, and two (2) Rooms with ADA communication features.  During the Term, Landlord shall, at Landlord's expense, comply with all Laws applicable to the Project (except to the extent such compliance is Tenant's obligation under this Section 8.1), and, Tenant shall, at Tenant's expense, subject to the provisions of this Lease, comply with all Laws applicable solely to Tenant's operation of its business in the Premises and Tenant's Work at the Premises during the Term.  If, however, Tenant's compliance with applicable Laws requires structural work or any work to the Building Systems within and exclusively serving the Premises, at Tenant's request, Landlord shall perform the work and, if the obligation to comply arises from Tenant's Work or Tenant's particular manner of using the Premises (in excess of typical guest house or hotel or short-term/extended stay rental use) or Tenant's particular operating model (not customary in operation of typical guest house or  short-term/extended stay rental), Landlord shall amortize the cost of such work over the useful life of such work, and Tenant shall reimburse Landlord for the costs applicable to the remainder of the Term of the Lease in equal monthly installments over the remainder of the Term.

8.2    <u>Hazardous Materials</u>.  Landlord represents and warrants to Tenant that Landlord has no knowledge of the presence of any Hazardous Materials on the Project in violation of any Environmental Laws.  On the Commencement Date, the Premises and Project will be in compliance with all Environmental Laws and free of contamination by Hazardous Materials in violation of the Environmental Laws.  If any Hazardous Materials are discovered in or on the Premises or the Project which are not released or otherwise caused by a Tenant Party, Landlord shall promptly notify Tenant thereof and cause the same to be inspected and remediated, at its sole cost and expense, in accordance with all applicable Laws to Tenant's reasonable satisfaction.  To the extent Tenant is unable to use the Premises (or any portion thereof) for the conduct of Tenant's normal business operations, or if Tenant is deprived of access to the Premises (or any portion

thereof) as a result of such inspection and/or remediation, the Base Rent shall abate in proportion to the portion of the Premises that Tenant is unable to use as a result thereof, and in the event such Hazardous Materials are caused by or within the reasonable control of Landlord and/or Landlord Parties, Tenant shall be entitled to additional abatement in the amount equal to 10% of Base Rent in proportion to the portion of the Premises that Tenant is unable to use as a result thereof. During the Term, Tenant shall, at its sole cost and expense, (i) comply with Environmental Laws relating solely to Tenant's use and occupancy of the Premises, and (ii) not cause the release of any Hazardous Materials in violation of Environmental Laws in the Premises. Landlord shall indemnify, defend and hold harmless Tenant and Tenant Parties from and against all Losses arising from or attributable to (x) any breach by Landlord of any of its warranties, representations or covenants in this Section 8.2, (y) any Hazardous Materials that exist on the Project as of the Commencement Date and any Hazardous Materials that are discovered in or on the Premises or the Project at any time during the Term which are not brought thereon by a Tenant Party, and (z) any violation of Environmental Laws related to the Project that is not caused by a Tenant Party. Tenant shall indemnify, defend and hold harmless Landlord and Landlord Parties from and against all Losses arising from or attributable to any breach by Tenant of any of its warranties, representations or covenants in this Section 8.2. During the Term, Landlord and Tenant shall work together to prepare a water management plan for the Project.

### Article 9.       SUBORDINATION; ESTOPPEL CERTIFICATES

9.1    Subordination.        The lien of this Lease is subject and subordinate to the lien of any Mortgage, provided that such subordination is expressly contingent on Tenant receiving a fully executed SNDA from each Mortgagee in accordance with this Section 9.1. On or prior to the Effective Date, Landlord shall obtain from a Mortgagee a SNDA in favor of Tenant in such commercially reasonable form as is then used by the holder of such Mortgagee and is reasonably acceptable to Tenant, which shall provide, inter alia, that so long as no continuing Event of Default exists, neither Tenant's right to quiet enjoyment under this Lease, nor the right of Tenant to continue to occupy the Premises and to conduct its business thereon, shall be interfered with or disturbed by Landlord or anyone claiming by, through or under Landlord, including Mortgagee. The lien of any Mortgage shall not cover Tenant's property located in or on the Premises, including, without limitation, Tenant's Property. Notwithstanding anything to the contrary set forth in this Lease, Tenant's receipt of the SNDA is a condition precedent to Tenant's delivery of the Bond to Landlord.

9.2    Estoppel Certificates.        Each of Landlord and Tenant shall, without charge to the other, within thirty (30) days following receipt of a request from the other party, sign and deliver to the requesting party, or any other person designated by that party, a written statement certifying (a) that this Lease is in full force and effect and has not been modified (or, if modified, setting forth all modifications); (b) the date to which the Rent has been paid; (c) whether or not, to its actual knowledge, there is then an Event of Default or any event has occurred which, with the serving of notice or the passage of time, or both, would give rise to an Event of Default, and if so, setting forth the specific nature of same; and (d) to its actual knowledge, any other factual matters reasonably requested by the other party or any person designated by the other party. Any estoppel certificate delivered pursuant to this Section 9.2 may be relied upon by the requesting party or any other person designated by the other party and named in such certificate.

9.3     Tenant Lender.        In the event Tenant secures financing in which Tenant grants to Tenant Lender a security interest in the leasehold estate under this Lease (which shall require prior written consent of Landlord, not to be unreasonably withheld, conditioned or delayed), Landlord agrees to the following:  (a) Tenant Lender shall have the right to do any act or thing required to be performed by Tenant under this Lease, and Landlord shall accept any such act or thing performed by Tenant Lender as if such act or thing was done by Tenant itself; and (b) Landlord will provide a copy of any notice of default sent to Tenant concurrently to Tenant Lender, and if Landlord shall become entitled to terminate this Lease due to an uncured Event of Default by Tenant, Landlord shall not terminate this Lease unless it has first given written notice to Tenant Lender of its intent to terminate this Lease and has given Tenant Lender at least thirty (30) additional days to cure the Event of Default to prevent such termination of this Lease; provided, however, that if such Event of Default (excluding any payment default) cannot reasonably be cured within such thirty (30) day period, then Tenant Lender shall have such additional period of time as is reasonably required to cure such Event of Default if Tenant Lender, with due diligence and in good faith, commences the cure of the same within the thirty (30) day period and thereafter diligently prosecutes the curing of such Event of Default.

### Article 10.        INSURANCE

10.1     Tenant shall, at Tenant's expense, maintain at all times during the Term the following minimum coverage:

10.1.1   Commercial General Liability covering Tenant against liability for bodily injury, personal and advertising injury and property damage, and the use and occupation by the Tenant, on an occurrence basis, with a combined single limit of $1,000,000 per occurrence and $2,000,000 aggregate. Coverage shall include premises liability, products/completed operations liability, and contractual liability including coverage for insured contracts;

10.1.2   Umbrella Liability Insurance to be excess and follow-form over the Commercial General Liability with limits of liability of $10,000,000.00; and

10.1.3   Personal property coverage provided under a Special Form or "All Risks" policy in an amount of the full replacement cost value of the Tenant's Property (which shall include Tenant's Work) and Landlord's FF&E in the Premises.

10.1.4   Workers' Compensation at Statutory Limits

10.2     Tenant's insurance policies shall: (a) be written with insurance companies authorized to do business in the State, at all times maintaining a minimum A.M. Best rating of A VIII, (b) as respects to all liability policies, coverage shall include Landlord and other parties as designated in writing by Landlord, as additional insureds, (c) be written on an occurrence basis, (d) provide that no cancellation can be effective without thirty (30) day written notice to Landlord (but ten (10) days' notice for nonpayment of premium), (e) be on a primary and non- contributory basis, and (f) include a waiver of rights of subrogation.

10.3     Upon Landlord's written request, Tenant shall deliver to Landlord copies of certificates evidencing the insurance required by this Lease to be maintained by Tenant on or

before the Commencement Date (and with respect to any insurance required pursuant to this Article 10 before the commencement of any Tenant's Work). Tenant may carry any required insurance under a blanket policy if such policy complies with the requirements of this Lease.

10.4    Landlord shall, at its sole cost and expense, maintain during the Term the following: (a) commercial general liability insurance covering damages that Landlord will be required to pay for any bodily injury, personal injury or material damage to a third party, with respect to the ownership and operation of the Project and the Premises by the Landlord, its employees, agents, contractors or the personnel for which Landlord is legally liable and contractual liability including coverage for insured contracts, on an occurrence basis and with a limit of $5,000,000.00 per occurrence, and (b) insurance against all risks of loss or damage to the Building (except usual exclusions in a standard "All Risk" policy) and Landlord's FF&E including water damage and earthquake with a replacement cost endorsement, in an amount equal to the full replacement cost of the Building, plus the cost of clearing.  Landlord shall further ensure that (i) Tenant is added as an additional insured on Landlord's commercial general liability policy for any claim arising from the Landlord's ownership of and operations at the Project; (ii) a waiver of subrogation endorsement and a primary wording endorsement are attached to its insurance policies; and (iii) Landlord shall deliver to Tenant insurance certificates establishing the insurance described herein, which certificates shall evidence the waiver of subrogation required herein, on or before the Commencement Date, and at least fifteen (15) days before the expiration of any such insurance.

10.5    Notwithstanding any contrary provision of this Article 10, Tenant and Landlord mutually agree to look first to the applicable insurance coverage in effect (or should be in effect under any policy required to be maintained under this Lease) in the event of any losses, regardless of the cause of any such losses.  Notwithstanding any other provisions of this Lease, Landlord and Tenant each releases the other party, and on behalf of itself and its insurers, waives its right to recovery against the other for loss or damage to the waiving party and its property to the extent that such loss or damage is insured against, or required to be insured against, under any insurance policy required in this Article 10. For the avoidance of doubt, the parties intend and hereby agree, that the risk of loss or damage to property or income shall be borne by the parties' insurance carriers. Landlord and Tenant each agrees to furnish to each insurance company which has or will issue such policies notice of the mutual waivers contained herein and to have the insurance policies properly endorsed, if necessary, to prevent the invalidation of said coverage by said waivers. This waiver shall not be effective to relieve any party failing to maintain the insurance required by this Lease.  The provisions of this Section 10.5 will survive the expiration or earlier termination of this Lease.

### Article 11.    CASUALTY

11.1    If all or any portion of the Premises is affected by Casualty, and this Lease is not terminated pursuant to this Section 11.1 or Section 11.2 below, Landlord shall, at Landlord's sole expense, promptly perform Restoration, excluding any damage to Tenant's Work or Tenant's Property (unless the Casualty is caused by Landlord's negligence or willful misconduct), and Tenant shall, at Tenant's expense, promptly remove Tenant's Property from the Premises to the extent safe to do so and reasonably required by Landlord in connection with the Restoration. From

the date of the Casualty until the date on which Tenant has prepared the Premises to substantially the same condition as existed prior to the Casualty and is able to use the Premises for the Permitted Use, the Base Rent shall be reduced in proportion to the area of the Premises to which Tenant shall not have access or which Tenant reasonably determines is unsuitable for the operation of its business. If Landlord undertakes but fails to complete the Restoration within one hundred and eighty (180) days after the date of such Casualty for any reason other than a Tenant Delay, then Tenant may terminate this Lease (without payment of any penalty, damages or termination fee to Landlord) by delivering written notice to Landlord within thirty (30) days after the expiration of such one hundred and eighty (180) day period, but before the Restoration has been completed by Landlord.

11.2    Notwithstanding anything to the contrary set forth herein, if (a) a Mortgagee will not release to Landlord the amount of any insurance proceeds due or received from a Casualty for any reason other than Landlord's default, negligence or willful misconduct, or (b) the time required to complete the Restoration exceeds one hundred and eighty (180) days (as estimated by a reputable third-party contractor selected by Landlord and reasonably approved by Tenant), (c) Tenant does not have access to all or any portion the Premises, or all or any portion of the Premises are unsuitable for the operation of Tenant's business due to Casualty for more than one hundred and eighty (180) days, or (d) if the Premises is materially affected by Casualty during the last twelve (12) months of the Term or any Renewal Term, each of Landlord and Tenant shall have the right, by written notice to the other party within thirty (30) days following the occurrence of the event set forth in (a), (b), (c) or (d) herein, to terminate this Lease (without payment of any penalty, damages or termination fee), and such termination shall be effective as of the date stated in such written notice, and any Rent paid by Tenant to Landlord for any period after that date shall be promptly refunded by Landlord to Tenant. A total destruction of the Building shall automatically terminate this Lease.

11.3    Notwithstanding anything to the contrary set forth in this Lease, if Tenant reasonably determines that it can no longer conduct its normal business in all or any portion of the Premises as a result of Casualty, Tenant, in its sole discretion, shall have the option to terminate the Lease (without payment of any penalty, damages or termination fee to Landlord) upon thirty (30) days' prior written notice to Landlord.

### Article 12.    CONDEMNATION

12.1    If as a result of a Taking, (a) all of the Premises, or so much thereof as renders the Premises wholly unusable by Tenant, is taken; (b) a portion of the Building or the Project is taken, resulting in Tenant no longer having reasonable access to or use of the Premises or a portion thereof; (c) all or substantially all of the Building or the Project is taken; or (d) a portion of the Building or the Project is taken resulting in Landlord's determination to demolish the Building, then the Term shall expire on the earlier of taking of possession by the condemning authority, the date of vesting of title pursuant to such Taking, or the date on which the Premises is no longer reasonably usable by Tenant for its normal business. In such event, the Rent shall be prorated as of the date of termination, and any Rent paid by Tenant to Landlord for any period after that date shall be promptly refunded by Landlord to Tenant.

12.2    If less than all of the Premises is taken, and Tenant reasonably determines that such partial Taking makes the Premises unsuitable for the operation of Tenant's normal business or otherwise materially interferes with Tenant's ability to conduct its normal business, in whole or in part, at the Premises, Tenant may terminate this Lease (without payment of any termination fee, damages or penalty to Landlord) upon the earlier of (a) thirty (30) days' prior written notice to Landlord, (b) the date on which the taking of possession by the condemning authority occurs or the date of vesting of title pursuant to such Taking, and (c) the date on which the Premises is no longer reasonably usable by Tenant for its normal business.

12.3    In the event of any such Taking of all or any part of the Premises, the Building or the Project, Landlord and Tenant each shall be entitled to an allocation of the award to be made in the proceedings related to the Taking relative to their respective interests in the Premises. For purposes of determining the value of Tenant's interest, it shall be assumed that Tenant would extend the Term for the maximum number of Renewal Periods.

12.4    If a Taking does not result in the termination of this Lease, (a) Landlord shall, at Landlord's sole cost and expense, as soon as practicable, restore that part of the Premises, the Building or the Project not taken, so that the Premises, the Building and/or the Project (as applicable) are restored to a condition substantially similar to the condition of the Premises, the Building and/or the Project (as applicable) prior to such Taking (including restoring the Premises to the extent necessary to form a complete and fully functioning space), and (b) from and after the date of Taking, the Base Rent shall be reduced permanently in the same proportion as the area of the Premises, if any, which was taken, as well as any equitable adjustment to the extent portions of the Project outside of the Premises (as applicable) are taken and materially impact Tenant's use and enjoyment of the Premises.

## Article 13.    ASSIGNMENT AND SUBLETTING

13.1    Except as provided in this Article 13, Tenant shall not, without Landlord's consent (which consent shall not be unreasonably withheld, conditioned, or delayed) perform a Transfer.  Notwithstanding the foregoing, Landlord acknowledges and agrees that Tenant may market and advertise Tenant's services and rental of Rooms within the Premises on online platforms, including, without limitation, Airbnb, HomeAway, VRBO, Expedia.com and Booking.com, and may enter into various sublease or license agreements of any duration concerning the Rooms, without having to provide Landlord notice of its intention to sublease or license and without having to obtain Landlord's consent to sublease or license, and Landlord hereby agrees to such subleases or licenses.  For the avoidance of doubt, the use and occupancy of the Premises by Tenant's guests or customers in accordance with the Permitted Use shall not be subject to the restrictions and prohibitions set forth in this Article 13.

13.1    If Tenant desires to perform a Transfer, Tenant shall give Landlord notice (a "**Proposed Transfer Notice**") of Tenant's terms of the proposed Transfer and the desired effective date of such Transfer, accompanied by (a) the proposed assignment or sublease, (b) a reasonably detailed description of the proposed assignee or subtenant, the nature of its business and its proposed use of the Premises, and (c) the proposed assignee or subtenant's current financial information, including its most recent financial statements to the extent available.  Tenant shall

reimburse Landlord for the actual and reasonable third-party costs that Landlord incurs in connection with the Transfer, including reasonable attorney's fees, not to exceed, in the aggregate, Two Thousand, Five Hundred and 00/100 Dollars ($2,500.00).

13.2    Upon receipt from Tenant of a Proposed Transfer Notice and information, Landlord shall have an option (hereinafter referred to as the "**Take Back Option**") to be exercised in writing within thirty (30) days after its receipt from Tenant of such Proposed Transfer Notice and information described in Section 13.2 above, to cancel or terminate this Lease without penalty as of the date set forth in Landlord's notice of exercise of such Take Back Option (the "**Take Back Notice**"), which date shall be not less than sixty (60) days nor more than one hundred twenty (120) days following the giving of such notice.

13.3    In the event Landlord shall exercise the Take Back Option by the giving of the Take Back Notice, Tenant shall have the right to revoke its Proposed Transfer Notice to assign this Lease by written notice (a "**Revocation Notice**") to Landlord given no later than ten (10) days after its receipt of the Take Back Notice, whereupon its Proposed Transfer Notice to the applicable assignment shall be deemed revoked, and Landlord's exercise of the Take Back Option in the instance of the applicable Proposed Transfer Notice shall be of no force or effect.

13.4    In the event Landlord shall exercise the Take Back Option, and Tenant shall not timely deliver Landlord a Revocation Notice as specified above, then Tenant shall surrender possession of the entire Premises on the date set forth in the Take Back Notice in accordance with the provisions of this Lease relating to surrender of the Premises at the expiration of the Term.

13.5    Landlord shall approve or disapprove of the proposed Transfer, or give a Take Back Notice, within thirty (30) days after Landlord's receipt of the documentation required under Section 13.2 above; provided, however, that if Landlord disapproves of such proposed Transfer, Landlord shall give a reasonably detailed explanation for its disapproval.  If Landlord fails to respond to Tenant within such 30-day period, Tenant may send Landlord a second request for approval containing the following language in bold print: "**THIS IS A SECOND REQUEST WITH RESPECT TO A PROPOSED [ASSIGNMENT] OR [SUBLETTING]. IF LANDLORD DOES NOT RESPOND TO THIS REQUEST WITHIN FIVE (5) DAYS, LANDLORD SHALL BE DEEMED TO HAVE APPROVED SUCH TRANSFER.**"  If Landlord fails to provide a response to Tenant's second request within such five (5)-day period, Landlord will be deemed to have approved the proposed Transfer.

13.6    Notwithstanding anything to the contrary contained in this Lease, no notice to or consent from Landlord shall be required, and the Take Back Option shall not apply, for any Transfer (a) to a corporation or other legal entity into or with which Tenant (or Tenant's direct or indirect parent company) is merged or consolidated, (b) to an entity to which all or substantially all of Tenant's assets are transferred, provided that any such merger, consolidation, transfer or other transaction is not principally for the purpose of transferring the leasehold estate created hereby, (c) to an Affiliate, or (d) in connection with either a bona fide financing for the benefit of Tenant or an initial public offering of Tenant's stock on a nationally-recognized stock exchange (and, following any such public offering, the sale or transfer of any such shares).  Furthermore,

notwithstanding anything to the contrary set forth herein, if Tenant delivers to Landlord reasonable documentation showing that any assignee either permitted herein or consented to by Landlord, or such assignee's guarantor, has equal or greater net worth as Tenant as of the Effective Date and such assignee has assumed in writing the obligations of Tenant under this Lease first accruing after the date of assignment, Tenant shall be released from all liability accruing under this Lease from and after the date of such assignment.

13.7     In the event of a transfer or sale of the Project by Landlord, the transferee or assignee shall be deemed to have assumed all of Landlord's obligations and liabilities under this Lease effective from and after the effective date of the transfer or assignment.

### Article 14.     LANDLORD ENTRY; CONSTRUCTION DURING THE TERM

14.1     Landlord shall have the right to enter the Premises, provided that (a) except in the event of an Emergency (in which case Landlord shall provide notice as soon as reasonably practicable in consideration of the circumstances), Landlord shall provide Tenant with at least forty-eight (48) hours' prior written notice of its entry into any occupied rooms and twenty-four (24) hours' prior written notice of its entry into any other portion of the Premises (note this notice can be sent via e-mail to gregg.klein@sonder.com), (b) except in the event of an Emergency, Landlord shall coordinate the timing of such entry with Tenant and shall not enter any Room that is occupied by Tenant's subtenants or guests, (c) in exercising its rights under this Section 14.1, Landlord shall use reasonable efforts to minimize interference with Tenant's or Authorized Parties' use or occupancy of the Premises or access thereto and the rights and privacy of the Authorized Parties, and (d) except in the event of an Emergency, Landlord and its representatives, at Tenant's option, shall be accompanied by a representative of Tenant and shall comply with the reasonable directions of such representative regarding the rights and privacy of the Authorized Parties. Landlord shall exercise Landlord's rights under this Section 14.1 in a commercially reasonable manner to minimize interference with the conduct of Tenant's business in the Premises and to prevent any damage to the Premises, Tenant's Work, and Tenant's Property (all of which shall promptly be repaired by Landlord at its expense if damaged during Landlord's entry).

14.2     Notwithstanding anything to the contrary in this Lease, Landlord shall not, except for short term closures for maintenance (subject to Landlord providing to Tenant no less than forty-eight (48) hours' prior written notice if it affects any occupied rooms and twenty-four (24) hours' prior written notice otherwise (note this notice can be sent via e-mail to gregg.klein@sonder.com)) or Emergencies (in which case Landlord shall provide notice as soon as reasonably practicable in consideration of the circumstance) take or permit any of the following actions without Tenant's prior written consent: close or alter any portion of the entranceways, exits, elevators or other accessways to and from the Premises, particularly accessible routes and options. Notwithstanding the foregoing, Landlord shall, at all times, provide adequate access to the Premises (e.g., some other alternate form of adequate access) to the Authorized Parties.

14.3     In the event Landlord or any Landlord Party performs, or permits to be performed, any construction, alteration, repair, replacement or maintenance to any portion of the Building, (a) Landlord or Landlord Party shall use best efforts to minimize interference with operations or occupancy of the Premises by the Authorized Parties, including, without limitation,

preventing any unreasonable interruption to HVAC, power, water and elevator service; (b) Landlord shall take proper security measures to prevent any unauthorized workers from accessing the Premises; (c) Landlord shall take all safety precautions around the area of the Building where the work is being performed for the occupants of the Building in compliance with all Laws, including, without limitation, properly securing such area from the rest of the Building, enclosing the perimeters with fences and protective sheeting and posting clearly visible signs; (d) any work that creates noise that can be heard from the Premises should be limited to 7 am - 6pm; (e) no debris or construction materials shall be placed on any portions of the Premises; (f) Landlord shall use reasonable efforts to avoid settling of or dispersion of dust onto the Premises; (g) all construction equipment and materials shall be located so as to prevent interference with operations or occupancy of the Premises by the Authorized Parties, and (h) Landlord shall promptly (i) repair any damage to the Premises (including Tenant's Work and Tenant's Property), (ii) remove any trash and construction waste, (iii) clean any dust, dirt and debris caused by such work, and (iv) mitigate any odor and off-gassing caused by such work.  For the avoidance of doubt, Landlord shall not be permitted to perform any work in the Premises without Tenant's prior written consent unless such work is expressly permitted in this Lease.

## Article 15.    QUIET ENJOYMENT

15.1    Landlord covenants and agrees that Tenant, so long as no Event of Default is continuing, shall lawfully, peaceably and quietly hold, occupy and enjoy the Premises during the Term without hindrance or molestation by Landlord or by any person or persons claiming by, through or under Landlord.  Landlord shall undertake and prosecute all reasonable and appropriate actions, judicial or otherwise, required to assure such quiet and peaceable occupation by Tenant.

15.2    Landlord shall not cause or permit the levels of noise caused by its or Landlord Parties' activities to exceed the levels permitted by applicable Laws and codes relating to the Building.  In the event Landlord or Landlord Parties shall cause vibration and/or noise which is transmitted to the Premises in such a manner as to cause a noise disturbance, discomfort or annoyance to a reasonably sensitive person, Landlord shall use commercially reasonable efforts to reduce or eliminate such vibration and/or noise.  .  With respect to any noise or vibration caused outside of the Building that is transmitted to is the Premises in such a manner as to cause a noise disturbance, discomfort or annoyance to a reasonably sensitive person, Landlord shall use commercially reasonable efforts to cooperate with Tenant to mitigate such noise or vibration.

## Article 16.    INTELLECTUAL PROPERTY

16.1    Tenant shall have the right to add its current Brand Name, "Sonder", to "284" which is a portion of the existing tradename for the Premises under which the Premises are currently operated by Landlord, or to otherwise identify the Premises with the then-applicable Brand Name for the Premises during the Term so long as "284" remains as part of the Building Name.  Landlord acknowledges that the Brand Name is a valuable property of Tenant and that the Brand Name is the exclusive property of Tenant and its affiliates.  No default of Tenant or any provision of this Lease confers upon Landlord, or its successors or assigns, the right to use the Brand Name for any purpose.

16.2    Landlord acknowledges that Tenant has a proprietary interest in all Proprietary Materials (whether or not subject to any registration or application for registration), which will be under the exclusive control of Tenant and its affiliates.  Landlord shall keep such Proprietary Materials confidential pursuant to that certain non-disclosure agreement, dated January 19, 2021, by and between Landlord and Tenant.

16.3    Tenant shall have the right to the exclusive use, without charge from Landlord, of all signage, inventory, websites, internet addresses, app and social media handles using the name or logo of "No. 284", or any derivative thereof, which is owned by Landlord from and after the Effective Date until the Expiration Date or the Termination Date (as applicable), and Landlord represents that it has the right to grant such license to Tenant.

<div align="center">

**Article 17.        INTENTIONALLY OMITTED**

**Article 18.        SIGNAGE**

</div>

18.1    Subject to compliance with applicable Laws and Landlord's approval (which approval shall be limited to size, color and location of such signage and shall not be unreasonably withheld, conditioned or delayed), Tenant shall have the right to install Tenant's signage on the exterior of the Building, in accordance with Tenant's signage standards.  Landlord shall respond to a request for such approval within ten (10) days after Tenant's submission thereof, provided, however, that if Landlord disapproves of such proposed signage, Landlord shall give a reasonably detailed explanation for its disapproval.  For the avoidance of doubt, Tenant shall be solely responsible for ensuring that Tenant's signage complies with all applicable Laws.  If Landlord fails to respond to Tenant within such 10-day period, Tenant may send Landlord a second request for approval containing the following language in bold print: "**THIS IS A SECOND REQUEST WITH RESPECT TO PROPOSED SIGNAGE. IF LANDLORD DOES NOT RESPOND TO THIS REQUEST WITHIN FIVE (5) DAYS, LANDLORD SHALL BE DEEMED TO HAVE APPROVED OF SUCH SIGNAGE.**"  If Landlord fails to provide a response to Tenant's second request within such five (5)-day period, Landlord will be deemed to have approved the proposed signage.  Notwithstanding the foregoing, Tenant may, without Landlord's consent, affix, install or place, all in compliance with applicable Laws: (a) any signs or other means of advertisement within the Premises that may not be seen from outside of the Building, such as signage in the lobby and wayfinding signage throughout the Premises, and (b) any signage (for identification and directional purposes) on its entry door and in the elevator lobby of each floor of the Premises.  In the event Tenant decides to change the name of the Building during the Term to the extent permitted under this Lease, then Tenant shall be permitted to change such signage to reflect the change of name of the Building without the consent of Landlord, provided such replaced signage is substantially similar to the signage previously approved by Landlord.

<div align="center">

**Article 19.        SURRENDER; HOLD OVER**

</div>

19.1    <u>Surrender</u>.  On the Expiration Date or the Termination Date, as applicable, (a) Tenant (and all other occupants) shall vacate and surrender the Premises broom clean and in good condition and repair, normal wear and tear typical for the Permitted Use, damage from

Casualty, damage from Landlord's failure to perform Landlord's repair and maintenance obligations, and damage for which Tenant is not responsible under this Lease excepted, and (b) Tenant shall remove from the Premises Tenant's Property which may be removed without material damage to the Premises or the Building and shall repair any damage to the Premises caused by the installation or removal of Tenant's Property. Tenant's Property which is not removed by Tenant by the Expiration Date shall, after written notice from Landlord to Tenant, be deemed abandoned and may, at Landlord's option, be retained as Landlord's property or disposed of by Landlord.

19.2    <u>Holdover</u>.  If, without Landlord's consent, any portion of the Premises is not vacated and surrendered in accordance with this Lease within thirty (30) days after the Expiration Date or the Termination Date, as applicable, Tenant shall be liable to Landlord, in an amount equal to one hundred fifty percent (150%) of the daily Base Rent applicable to the Lease Year immediately preceding the Termination Date, for each day that Tenant holds over in the portion of the Premises that Tenant has failed to vacate on a pro rata basis.  If Tenant remains in possession of any portion of the Premises after the Expiration Date or the Termination Date, as applicable, with Landlord's consent, such possession by Tenant shall be deemed to be a month-to-month tenancy with respect to the applicable portion of the Premises terminable on thirty (30) days' written notice given at any time by Landlord or Tenant.  All provisions of this Lease except for those pertaining to the Term shall apply to any such tenancy.  In no event, however, shall this Section 19.2 be construed as permitting Tenant (and all other occupants) to remain in possession of the Premises after the Expiration Date or the Termination Date, as applicable.  Without limiting the foregoing, if Tenant hold over, Tenant shall also be responsible for, and indemnify and hold Landlord harmless from and against, any direct damages suffered by Landlord as a result of any such holding over for longer than thirty (30) days after the Expiration Date or Termination Date, as applicable, provided Landlord provides Tenant with at least thirty (30) days' prior notice of such potential direct damages arising out of the holdover.

## Article 20.    DEFAULT

20.1    <u>Tenant Event of Default</u>.  The occurrence of any of the following shall constitute a default and breach of this Lease by Tenant (hereafter an "**Event of Default**"):

20.1.1    If Tenant fails to pay any installment of Rent as and when due, where such failure continues for more than five (5) business days after receipt of written notice thereof by Landlord to Tenant, provided that Landlord shall only be required to send such written notice of such default once in any rolling twelve (12) month period, it being understood that any further default after the sending of the such written notice by Landlord in any rolling twelve (12) month period shall automatically be deemed an Event of Default hereunder without first having to provide Tenant written notice and an opportunity to cure; or

20.1.2    If Tenant fails to perform any of Tenant's non-monetary obligations under this Lease for a period of thirty (30) days after receipt of written notice thereof from Landlord; provided that it shall not be an Event of Default if Tenant commences such performance within said thirty (30)-day period and thereafter diligently prosecutes such cure to completion; or

20.1.3  If (a) Tenant makes a general assignment or general arrangement for the benefit of creditors; (b) Tenant files a petition for adjudication of bankruptcy or for reorganization or rearrangement is filed by or against Tenant and is not dismissed within ninety (90) days after the filing or entry of such petition; (c) a trustee or receiver is appointed to take possession of substantially all of Tenant's assets located at the Premises or of Tenant's interest in this Lease and possession is not restored to Tenant within sixty (60) days; or (d) substantially all of Tenant's assets located at the Premises or Tenant's interest in this Lease is subjected to attachment, execution or other judicial seizure which is not discharged within sixty (60) days.

20.2  <u>Landlord Default</u>.  In the event Landlord breaches any of the representations or warranties contained in this Lease, or fails to keep, observe or perform any of its obligations or covenants contained herein, and such breach is not cured within thirty (30) days after written notice thereof (or such longer period as is reasonable to cure said default, if said default cannot reasonably be cured within thirty (30) days, provided that Landlord promptly commences to cure within such thirty (30) day period and diligently prosecutes such cure to completion), Tenant, in addition to any rights it has at law or equity, shall have the right to terminate this Lease upon notice to Landlord.  In addition to Tenant's rights contained herein and elsewhere in this Lease or available at law or equity, in the event Landlord neglects or fails to comply with any of Landlord's obligations and covenants contained in this Lease beyond any applicable notice and cure periods, Tenant may, in its sole and absolute discretion, (i) cure any such Landlord's default, and (ii) withhold from Rent any amounts incurred by Tenant in curing any such default (including Tenant's reasonable attorneys' fees and expenses) after giving Landlord not less than ten (10) days' prior written notice, or without notice in the case of any Emergency where, in Tenant's reasonable judgment, an immediate action is necessary to (a) protect the safety of any Authorized Party at the Project, (b) comply with applicable insurance requirements or Laws, or (c) protect the Project from damage, and without waiving or releasing Landlord from any of its obligations.

## Article 21.    LANDLORD REMEDIES.

21.1  Upon the occurrence and continuance of any Event of Default by Tenant, Landlord shall have, subject to the provisions set forth in this Article 21, the option to pursue any one or more of the following remedies, each and all of which shall be cumulative and non-exclusive:

21.1.1  Terminate this Lease, in which event Tenant shall immediately surrender the Premises to Landlord upon notice from Landlord, and if Tenant fails to do so, subject to applicable Laws, Landlord may, without prejudice to any other remedy which it may have for possession or arrearages in Rent, enter upon and take possession of the Premises and expel or remove Tenant and any other person who may be occupying the Premises or any part thereof, without being liable for prosecution or any claim for damages therefor. Upon termination of this Lease by giving Tenant written notice of its election to do so, Landlord shall have the right to recover the following sum from Tenant: (i) the Additional Rent in the "Full Payment Amount" remaining at the time of such termination as set forth in **Exhibit I**, (ii) all accrued and unpaid Rent through the date of termination plus six (6) months of then-current Base Rent as liquidated damages, (iii) any late charges on accrued and unpaid Rent, and (iv) all other additional sums for which Tenant is liable under any of the provisions of this Lease, which may be then owing and

unpaid, and all costs and expenses, including, without limitation, court costs and reasonable attorneys' fees incurred by Landlord in the enforcement of its rights and remedies hereunder. Notwithstanding anything in this Article 21 to the contrary, if Tenant does not surrender the Premises to Landlord as required under this Lease and reasonably cooperate with Landlord in the turnover of management of the Premises and existing Bookings to Landlord or its nominee, Landlord shall have all remedies at law or in equity for breach of this Lease without the foregoing limitations.

21.1.2  If Landlord does not elect to terminate this Lease on account of any Event of Default by Tenant, Landlord may, subject to Landlord's obligation to mitigate its damages, from time to time, without terminating this Lease, enforce all of its rights and remedies under this Lease, including the right to recover all Rent as it becomes due.

21.1.3  Landlord shall at all times have the rights and remedies, without prior demand or notice except as required by applicable Laws, to seek any declaratory, injunctive or other equitable relief, or restrain or enjoin a violation or breach of any provision hereof.

Upon the occurrence and continuance of an Event of Default, Landlord shall use good faith and commercially reasonable efforts to mitigate its damages, including, without limitation, using commercially reasonable efforts to lease the Premises or any part thereof.

21.2    No failure by Landlord or by Tenant to insist upon the performance of any of the terms of this Lease or to exercise any right or remedy upon an Event of Default, and no acceptance by Landlord of full or partial Rent from Tenant or any third party during the continuance of any Event of Default, shall constitute a waiver of any such Event of Default or of any of the terms of this Lease.  None of the terms of this Lease to be kept, observed or performed by Landlord or by Tenant, and no breach thereof, shall be waived, altered or modified except by a written instrument executed by Landlord and/or by Tenant, as the case may be.  No waiver of any breach shall affect or alter this Lease, but each of the terms of this Lease shall continue in full force and effect with respect to any other then existing or subsequent breach of this Lease.

## Article 22.    BROKER

Each of Tenant and Landlord represents to the other party that it has not dealt with any broker in connection with this Lease other than Broker. Each party shall indemnify, defend and hold the other party harmless from and against any claims for any brokerage commissions or other compensation which are made by any broker alleging to have dealt with Tenant or Landlord (as applicable) in connection with this Lease other than Broker. Landlord and Tenant shall pay Broker any commissions due to Broker in connection with this Lease pursuant to a separate agreement.

## Article 23.    REPRESENTATIONS AND WARRANTIES

23.1    Landlord hereby makes the following representations and warranties to Tenant, upon which Landlord acknowledges and agrees Tenant is entitled to rely, which representations and warranties shall be true and correct as of the Effective Date and as of the Commencement Date:

23.1.1   (a) Landlord is duly formed, validly existing and in good standing in the jurisdiction of its formation or organization, as applicable; (b) Landlord has the full power and authority to execute and deliver this Lease and to perform all obligations of Landlord hereunder and has obtained all consents required to do so (including consent of any Mortgagee), and the execution and delivery by the individual executing the Lease on behalf of Landlord has been duly and validly authorized by all necessary action by Landlord; and (c) Landlord is the owner of fee simple title to the Project, free and clear of any lien, pledge, security interest, charge, claim, mortgage, deed of trust, option, warrant, purchase right or option, right of first refusal or similar right, lease, contract, easement or other encumbrance or restriction other than any Mortgage previously disclosed to Tenant, which would preclude or otherwise adversely affect Tenant's Permitted Use or other rights or benefits under this Lease, and (d) Landlord has good and valid title to Landlord's FF&E, which shall be free and clear of all liens and encumbrances as of the Commencement Date.

23.1.2   Neither the execution of this Lease nor the performance of Landlord's obligations hereunder by Landlord or any Landlord Party will (a) conflict with or result in a breach of the terms, conditions, and provisions of or constitute a default, or result in the termination of any agreement or instrument (other than those instruments or agreements to be terminated on or before the Commencement Date) to which Landlord is a party or by which Landlord may be bound, (b) violate any restrictions to which Landlord is subject, or (c) constitute a violation of applicable Laws.

23.1.3   (a) Landlord has not received any notice of a violation of any applicable Laws with respect to the Project which has not been cured or dismissed; (b) no administrative proceeding, investigation or inquiry is pending or, to Landlord's knowledge, threatened with respect to any violation of applicable Laws with respect to the Project; and (c) to Landlord's knowledge, there is no existing violation of any applicable Laws with respect to the Project.

23.1.4   (a) No litigation, arbitration, administrative or other adjudicatory proceeding or legal action is pending or, to Landlord's knowledge, threatened, with respect to the Project; (b) Landlord has not received any court filing, formal written charge, complaint, claim or written request for arbitration, mediation, administrative hearing/proceeding or similar legal or quasi-legal proceeding with respect to the Project, which has not been resolved, settled or dismissed; (c) no injunction, decree, order, writ or judgment is outstanding with respect to the Project; and (d) no claim which may result in any of the foregoing has been threatened in writing.

23.1.5   Landlord has not made any general assignment for the benefit of creditors, become insolvent or filed a petition for voluntary bankruptcy or filed a petition or answer seeking reorganization or an arrangement or composition, extension or readjustment of its indebtedness or consented, in any creditors' proceeding, to the appointment of a receiver or trustee of Landlord or the Project or any part thereof of either of them or been named in an involuntary bankruptcy proceeding, and to Landlord's knowledge, no such actions are contemplated or have been threatened.

23.1.6   There are no ongoing alterations or improvement projects at the Project that have commenced on or before the date hereof that will not be completed prior to the Commencement Date.

23.1.7   Landlord has made available to Tenant true, correct and complete copies of all Licenses and Permits that are currently in effect.  To Landlord's knowledge, the Licenses and Permits comprise all of the licenses, permits and similar authorizations required by the Governmental Authority for the use and occupancy of the Project and lodging activities on the Project.

23.1.8   Landlord has made available to Tenant true, correct and complete records of major repairs and replacements conducted at the Project in the last two (2) years.

23.1.9   To Landlord's knowledge, there exists no indoor mold growth, Legionella or any other types of waterborne contaminants in the Building Systems, and Landlord has no knowledge of any such growth or contaminants in the Project's history. To Landlord's knowledge, the Project is presently maintained and has been maintained in such a manner as to prevent excess humidity, or accumulation of moisture that may promote the growth of molds or other fungi and other microorganisms, and the water systems are maintained to prevent the growth of Legionella bacteria.

23.1.10  The occupancy, ADR and RevPAR data from March to December of 2018 and January to December of 2019 provided to Tenant are in all material respects true, correct and complete and accurately depict the past performance of the hotel operations at the Project.

23.1.11  There are no outstanding gift certificates, vouchers, coupons or similar items for free or discounted use of any of the Premises (including, without limitation, the Rooms).

23.1.12  Landlord has three (3) employees who perform services for the hotel operations at the Project (the "**Employees**").  To Landlord's actual knowledge, on or after the Commencement Date, there will be no facts or circumstances that could result in any liability to Tenant with respect to any of the Employees with respect to their employment with Landlord.

23.1.13  Landlord has not entered into or assumed any employment contacts, labor agreements, collective bargaining agreements or other legal instruments with any unions (including, without limitation, those that would obligate Tenant in any way to employ the Employees or any other employees or be subject to union activity of any kind, including, but not limited to, union organizing, card check demands, picketing, leafleting or boycott, at the Project during the Term). Landlord is not a signatory to any labor agreements with any unions (including, without limitation, those that could obligate Tenant to any legal or contractual obligations under any labor agreement or collective bargaining agreement, including union organizing activities, at the Project during the Term). There has not been any attempt at union organizing activities at the Project.

23.2    Tenant hereby represents and warrants to Landlord that (a) Tenant is duly incorporated, validly existing and in good standing in the jurisdiction of its incorporation; and (b) Tenant has the full power and authority to execute and deliver this Lease, and the execution and delivery by the individual executing the Lease on behalf of Tenant has been duly and validly authorized by all necessary action by Tenant.

## Article 24.    LANDLORD COVENANTS

24.1    Landlord shall retain all Retained Liabilities.

24.2    Commencing on the Effective Date and until the Termination Date or the Expiration Date, as applicable, Landlord shall not enter into any agreement (including any covenant, condition or restriction) that may materially and adversely affect Tenant's use of the Premises for the Permitted Use.

24.3    During the Term, Landlord shall maintain in good standing and renew all Licenses and Permits prior to their expiration with respect to the Project.

24.4    Intentionally Omitted.

24.5    From the Effective Date and until the Commencement Date, Landlord shall operate the business at the Project in the ordinary course of business, including, without limitation, causing the inventories of Landlord's FF&E to be maintained at levels maintained in the ordinary course of business and causing to be maintained Landlord's FF&E in the same condition as they existed as of the Effective Date (reasonable wear and tear excepted). Landlord shall not trade, substitute, transfer, dispose of or remove any Landlord's FF&E except consumable inventory in the ordinary course of business, provided that the foregoing does not preclude the replacement by Landlord of any damaged FF&E with new FF&E of substantially similar kind and quality.

24.6    On or before the Commencement Date, Landlord shall terminate all Employees (if any) at its sole cost and expense. All wages, salaries and any other sums due and payable to the Employees in respect of the period on and prior to the Commencement Date shall be paid by Landlord as of the Commencement Date. Tenant shall not be liable for any failure of Landlord to comply with Employment Laws. Landlord shall retain all liabilities and obligations in connection with any employment claims, charges or grievances by any Employees and any violations of the Employment Laws and indemnify, defend and hold Tenant and Tenant Parties harmless from and against (a) any and all Losses arising out of or related to ownership of the Project or operation of its business at the Project prior to the Commencement Date, and (b) any and all Losses arising out of or related to the employment and discharge of the Employees.

24.7    Landlord further covenants that commencing on the Effective Date and throughout the Term, it will not enter into any employment contacts, labor agreements, collective bargaining agreements or other legal instruments with any unions (including, without limitation, those that would obligate Tenant in any way to employ any employees at the Project or be subject to union activity of any kind, including, but not limited to, union organizing activities) without

Tenant's prior written authorization, except for any third-party contracts to provide Landlord's Services.

24.8    From the Effective Date and until the Commencement Date, Landlord shall continue accepting Bookings until fourteen (14) days prior to the Commencement Date in the ordinary course of business, at Landlord's regular room rates.  On or before the date that is ten (10) days following the Effective Date and on the date that is fourteen (14) days prior to the Commencement Date, Landlord shall provide to Tenant all information necessary to honor Bookings that are scheduled to occur on or after the Commencement Date (both "definitive" (meaning that such Bookings include the agreed rooms and rate and other charges and that the requisite rooms are blocked in the hotel's sales system) and "tentative") that are listed on **Exhibit J** attached hereto, which includes guest names and contact information (email address or phone number), number of guests, dates of stay, booking rates, payment information, reservation ID, channel, amount of any deposits, status of payment (prepaid or unpaid), cancellation terms, commission rate, commission amount, resort fee (if applicable).  Landlord covenants, represents and warrants to Tenant that Landlord's transfer to Tenant of the information listed on **Exhibit J** and related Bookings data complies with relevant Privacy Laws.  Tenant shall have the right to offset against the next installment of the Rent due the amount of any prepaid reservations, advance room deposits, and any other form of deposits for Bookings scheduled to occur on or after the Commencement Date which Tenant assumes as of the Commencement Date, except to the extent any such deposits or pre-paid amounts are transferred to Tenant on the Commencement Date.  Tenant shall also have the right to offset against the next installment of the Rent due the face value (or to the extent no face value is provided, in an amount to be mutually agreed to by the parties on or prior to the Commencement Date) of any gift certificates, vouchers, coupons, trade credits, trade outs, barter arrangement, loyalty redemption Bookings or other discounted or free services or accommodations that are scheduled or otherwise available to be made on or after the Commencement Date which Tenant assumes as of the Commencement Date, except to the extent the face value thereof are transferred to Tenant on the Commencement Date.  In addition, Tenant and Landlord (acting reasonably and in good faith) shall reconcile between themselves all items to be adjusted for which figures are not available and/or cannot be definitely calculated accurately as of the Commencement Date within sixty (60) days following the Commencement Date, including, without limitation, any room revenue generated through any online travel agencies (the "**OTA(s)**") for the month the Commencement Date occurs.  Notwithstanding anything to the contrary set forth in this Lease, on or prior to the Commencement Date, Landlord shall cancel, at its sole cost and expense, (i) any Bookings made through the OTAs other than Booking.com,  Expedia, VRBO or Airbnb that are scheduled to occur on or after the Commencement Date, and (ii) any Bookings Tenant is unable to assume due to lack of necessary information to honor those Bookings. Landlord shall permit Tenant to continuously extract any future Bookings data via an electronic download from the sales system commencing on the date that is thirty (30) days prior to the Commencement Date.

24.9    Commencing on the Effective Date, Landlord shall provide Tenant with access to all of the OTA accounts (including Google My Business account) in order for Tenant to assume the listing from such OTA accounts and honor the Bookings Tenant assumes pursuant to Section 24.8 hereof, and Landlord shall fully cooperate with Tenant in connection therewith.

24.10    Subject to Tenant's review and approval (which shall not be unreasonably withheld, conditioned or delayed), Landlord shall, on or before the Commencement Date, send a notice to all the booking account managers of the OTAs (including Google My Business) regarding change in ownership of listings to Tenant.  As of the Commencement Date, Landlord shall, at Landlord's sole cost and expense, terminate any agreement relating to the Project between Landlord and the OTAs with which Tenant does not have a relationship with, unless Tenant instructs Landlord otherwise.

24.11    Subject to Tenant's review and approval (which shall not be unreasonably withheld, conditioned or delayed), Landlord shall, on or before the Commencement Date, send an announcement to all guests and customers at the Project whose contact information is available in Landlord's database, and all persons who have Bookings on or after the Commencement Date, informing such persons of the change in operation of the business at the Project and the change in brand name, in form and substance reasonably acceptable to Tenant.

24.12    Landlord shall fully cooperate with Tenant following the Effective Date to effectuate a smooth transition of management and operation of the business at the Premises to Tenant, and Tenant shall fully cooperate with Landlord upon the Termination Date or the Expiration Date, as applicable, to effectuate a smooth transition of management and operation of the business at the Premises back to Landlord or Landlord's designee.

24.13    On or before the Commencement Date, Landlord shall grant Tenant sole and exclusive control of and the right to operate (including the right, at Tenant's discretion, to link same to sonder.com) the websites, domain names, internet addresses, apps and social media handles, all business listings, including, not limited to, Google My Business, Yelp, Bing and any and all reservation platforms, and all accounts on advertising platforms, including, but not limited to Google (hotel ads and vacation rental), TripAdvisor and Facebook Business Manager, with respect to the Premises and facilitate such transfer of control, including, without limitation, unlocking domain names, providing transfer codes to Tenant, and taking any other reasonable steps requested by Tenant to effectuate such transfer.  Such control and right granted by Landlord shall be automatically terminated upon the Termination Date or the Expiration Date, as applicable, and Tenant shall facilitate such return of control and right as may be requested by Landlord.

24.14    All utility services to be paid by Tenant under this Lease shall be prorated as of the Commencement Date between Landlord and Tenant.  The parties shall use commercially reasonable efforts to obtain readings for all utilities as of the Commencement Date.  If readings cannot be obtained as of the Commencement Date, the cost of such utilities shall be prorated as of the Commencement Date once the reading is obtained.

24.15    Within ten (10) days following the Effective Date, Landlord shall deliver to Tenant a list of and copy of each Property Contract (as hereinafter defined) then in effect with a certificate representing and warranting that the copies are true, accurate and complete copies of such Property Contracts, and that there are no defaults exist thereunder, and no circumstances which with the passage of time would constitute a default.  On or before thirty (30) days prior to

the Estimated Commencement Date, Tenant shall inform Landlord in writing which Property Contracts it desires to assume as of the Commencement Date.  Prior to the Commencement Date, Landlord shall, at its sole cost and expense, terminate any Property Contract which Tenant does not expressly elect to assume. With respect to any Property Contracts Tenant elects to assume, Landlord shall assign such contract to Tenant as of the Commencement Date pursuant to an assignment and assumption agreement in a form reasonably acceptable to Landlord and Tenant. Any amounts prepaid, accrued or due and payable under any Property Contracts assumed by Tenant shall be prorated between Landlord and Tenant as of the Commencement Date, and (a) if such amounts have been previously paid by Landlord, the prorated amount for the period after the Commencement Date shall be paid by Tenant with the next installment of the Rent due; or (b) if such amounts remain outstanding, Tenant shall have the right to offset the Rent for such amount with the next installment of the Rent due.

## Article 25.       INDEMNIFICATION

25.1     Subject to the terms of Article 10, Tenant shall, to the fullest extent permitted by applicable Laws, indemnify, defend and hold Landlord Parties harmless from any and all Losses relating to any claims brought by a third party directly resulting from, and any Losses directly resulting from, (a) any breach by Tenant of its representations, warranties and/or covenants contained in this Lease, (b) any negligence or willful misconduct of Tenant Parties in the Premises during the Term; provided that this indemnification shall not apply to the extent any Loss is caused in whole or in part by the negligence or willful misconduct of Landlord and/or Landlord Parties, and (c) any accident, injury or damage occurring in the Premises unless caused by the negligence or willful misconduct of Landlord and/or Landlord Parties; provided that this indemnification shall not apply to the extent any Loss is caused in whole or in part by the negligence or willful misconduct of any Landlord Party. Tenant, upon notice of any such action or proceeding by a Landlord Party, shall defend such action or proceeding (by counsel reasonably satisfactory to such Landlord Party).

25.2     Subject to the terms of Article 10, Landlord shall, to the fullest extent permitted by applicable Laws, indemnify, defend and hold Tenant Parties harmless from any and all Losses relating to any claims brought by a third party directly resulting from, and any Losses directly resulting from (a) any breach by Landlord of its representations, warranties and/or covenants contained in this Lease, (b) any negligence or willful misconduct of Landlord or Landlord Parties, and (c) the Retained Liabilities; provided that this indemnification shall not apply to the extent any Loss is caused in whole or in part by the negligence or willful misconduct of any Tenant Party. Landlord, upon notice of any such action or proceeding by a Tenant Party, shall defend such action or proceeding (by counsel reasonably satisfactory to such Tenant Party).

25.3     Notwithstanding any contrary provision of this Article 25, Tenant and Landlord agree to look first to the applicable insurance coverage in effect (or that should be in effect under any policy required to be maintained under this Lease) in the event of any Losses, regardless of the cause of any such Losses.  The parties' indemnification obligations under this Article 25 shall survive the expiration or termination of this Lease.

## Article 26.       NOTICES

26.1     Except as may be provided in this Lease, all notices, demands, requests and other communications given or required to be given by either party to the other under this Lease must be in writing and sent by nationally recognized overnight courier service or registered or certified mail (return receipt requested), addressed to Landlord or Tenant at its respective Notice Address set forth under Basic Lease Information, or at such other place as either party from time to time may designate in writing to the other party, or via email provided that a paper copy shall follow via one of the additional notice methods listed above.  Any notice or other communication sent as provided in this Article 26 shall be effective (a) on the date received (or rejected) if sent overnight courier service, (b) five (5) business days after mailing by registered or certified mail, or (c) on the day sent if emailing or the next business day if the email is sent after 5pm (local time for the Premises).

## Article 27.     MISCELLANEOUS

27.1     This Lease shall be governed by the Laws of the State, and the parties irrevocably submit to the exclusive jurisdiction of the State and federal district courts of competent jurisdiction in the State with respect to all matters relating to this Lease.

27.2     Subject to the provisions of this Lease, this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective legal representatives, successors and assigns.

27.3     This Lease may not be modified, changed, altered or amended, in whole or in part, except in a writing signed by both Landlord and Tenant.

27.4     This Lease and any exhibits, schedules and addenda referred to herein, constitute the final and complete expression of the parties' agreements with respect to the leasing of the Premises.  Each party agrees that it has not relied upon or regarded as binding any prior negotiations, representations, or understandings with respect to the leasing of the Premises, whether oral or written, except as expressly set forth herein and all prior negotiations, representations and understandings with respect to the leasing of the Premises are superseded and replaced by this Lease.

27.5     Notwithstanding any provision of this Lease, or any applicable Laws, to the contrary, or the execution of this Lease by Tenant, this Lease shall not bind or benefit Landlord or Tenant, unless and until this Lease is signed and delivered by both Landlord and Tenant.

27.6     At the request of either party, Landlord and Tenant shall execute a memorandum of lease on the form attached hereto as **Exhibit E**, which may be recorded with the registry of deeds in the county in which the Project is located.

27.7     The parties shall hold in confidence and shall not disclose to third parties the terms of this Lease, and Landlord shall hold in confidence and not to disclose to third parties any other Proprietary Materials, except that each party hereto may disclose such information to its officers, directors, partners, members, employees, representatives, agents, brokers, lenders, prospective lenders, investors, prospective investors, attorneys, accountants and advisors who have signed a commercially reasonable non-disclosure agreement, prior to any disclosure to such party.

27.8    Neither Landlord nor Tenant shall make any public announcement respecting this Lease, the terms herein or any of the transactions contemplated hereunder without the prior written approval of the other party. Any such public announcement shall be subject to the other party's review and approval of the form and substance thereof prior to such public announcement, or as required under applicable Laws, in which case no such review and approval by the other party shall be required. Furthermore, upon request, Landlord shall allow Tenant to communicate with any other tenants of the Project and shall cooperate with Tenant's reasonable requests to facilitate such communications.

27.9    Upon Tenant's request for Works, Landlord shall provide such materials in its possession or control to Tenant. For any Works delivered to Tenant, Landlord hereby grants to Tenant, its subsidiaries, licensees and its successors and assigns, a royalty-free, non-exclusive, worldwide license to reproduce, modify, distribute, and create derivative works of the Works, for the purpose of advertising and promotion of the Premises in any media or format, including online listings and other promotional materials. Landlord hereby waives any and all moral rights or droit rights or any rights to similar effect that it may have in the Works. Landlord represents and warrants to Tenant that (a) it is the owner of the Works or has sufficient rights to grant the license granted herein; (b) the Works do not infringe on the rights of any third party, including, but not limited to, copyright rights; and (c) Landlord is not aware of any threats or claims that the Works infringe on such rights of any third party.

27.10    Any Schedules, Exhibits and Addenda attached to this Lease are a part of this Lease.

27.11    The captions in this Lease are for reference only and do not define, limit or enlarge the scope of this Lease or the intent of any term. All Article and Section references in this Lease shall, unless the context otherwise specifically requires, be deemed references to the Articles and Sections of this Lease.

27.12    If any provision of this Lease, or the application thereof to any person or circumstance, is invalid or unenforceable, then in each such event the remainder of this Lease or the application of such provision to any other person or any other circumstance (other than those as to which it is invalid or unenforceable) shall not be affected, and each provision hereof shall remain valid and enforceable to the fullest extent permitted by Laws.

27.13    If either party hereto is comprised of two or more persons, the liability of those persons under this Lease shall be joint and several. Wherever appropriate in this Lease, personal pronouns shall be considered to include other genders and the singular to include the plural.

27.14    This Lease may be executed in one or more counterparts. The parties contemplate that they may be executing counterparts of this Lease by facsimile, PDF or other electronic means and agree and intend that a signature by facsimile, PDF or other electronic means shall bind the party so signing with the same effect as though the signature were an original signature.

27.15   For the avoidance of doubt, whenever Tenant is entitled to an abatement of Rent based on the portion of the Premises that is not usable by Tenant, subject to the terms and conditions of this Lease, the percentage or Rent abated shall be based on the total number of Rooms not able to be used by Tenant (in whole or in part) as a result of the specific event causing the abatement divided by the total number of Rooms in the Premises.

27.16   Landlord and Tenant each hereby certifies that it is in compliance with the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act (the "**Patriot Act**") and the Executive Order 13224 (the "**Executive Order**") and, in particular, Landlord and Tenant acknowledge that (a) it is prohibited from doing any business with any persons who commit, threaten to commit, or support terrorism; (b) Landlord and Tenant, each for themselves and their respective officers and directors, are not persons who commit, threaten to commit, or support terrorism; and (c) Landlord and Tenant shall take commercially diligent steps to ensure that it shall comply with the Patriot Act and Executive Order during the Lease Term.   Landlord and Tenant shall indemnify and hold the other and its agents harmless from and against any Losses arising from its respective breach of the foregoing sentence. The indemnification and hold harmless above shall survive the termination of this Lease.

27.17   A Force Majeure Event shall extend the due date for a party's performance of an obligation under this Lease for the reasonable duration of such Force Majeure Event. Specifically, for any Force Majeure Event that materially and adversely impacts Tenant's financial returns (as reasonably determined by Tenant): (a) if the Commencement Date has not occurred, at Tenant's election, the Commencement Date shall be extended day-for-day, and (b) if the Commencement Date has occurred, Tenant shall receive a day-for-day abatement of Rent unless and except to the extent Tenant receives abatement of Rent under Section 3.6 above.

Furthermore, in the event of a change in Laws (or an interpretation thereof) or new Laws which materially restricts Tenant's ability to carry on its business as a guest house/lodging house at the Premises, or which materially and adversely impacts Tenant's financial returns (as reasonably determined by Tenant), Tenant shall have the right to terminate the Lease upon sixty (60) days' prior written notice to Landlord, or to reduce the Rent in an amount equal to the financial impact resulting from such change in law (or an interpretation thereof) upon the written approval of Landlord.   Upon such termination, this Lease shall be cancelled and of no further force or effect, and neither party shall have any further obligations under this Lease, except for any obligations which expressly survive the termination of this Lease.

27.18   The failure of Landlord or Tenant to seek redress for violation of, or to insist upon the strict performance of, any covenant or condition of this Lease shall not prevent a subsequent act which would have originally constituted a violation from having all the force and effect of an original violation.

27.19   Notwithstanding any provision of this Lease to the contrary (including, without limitation, any indemnification provision), in no event shall Landlord, Tenant or any of their members, partners, directors, officers, shareholders, employees, advisors or agents be responsible for any consequential, punitive, exemplary, or special damages, except to the extent of

any consequential, punitive, exemplary, or special damages arising from Landlord's breach of its confidentiality obligations under this Lease.

27.20    Dispute Resolution.

27.20.1 Arbitration.  Any claim to enforce or for breach of Section 3.6 (Rent Relief), Articles 6 (Services and Utilities) and 7 (Repairs, Maintenance and Replacement), Section 15.2 (Noise and Vibration), or Exhibit C shall be determined by expedited arbitration in the City before a single neutral arbitrator.  The arbitration shall be administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, including the Expedited Procedures set forth therein (regardless of the amount in controversy).  Judgment on the award may be entered in any court of competent jurisdiction.

27.20.2 Mediation.  If any dispute arises out of or relates to this Lease (other than a claim to enforce or for breach of Section 3.6 (Rent Relief), Articles 6 (Services and Utilities) and 7 (Repairs, Maintenance and Replacement), Section 15.2 (Noise and Vibration), or Exhibit C), and such dispute cannot be resolved through negotiation between Landlord and Tenant, the parties hereto agree to participate in a mediation administered by the American Arbitration Association under its Commercial Mediation Procedures before resorting to litigation.

27.20.3 Jurisdiction.  Except with respect to claims to enforce or for breach of Section 3.6 (Rent Relief), Articles 6 (Services and Utilities) and 7 (Repairs, Maintenance and Replacement), Section 15.2 (Noise and Vibration), or Exhibit C, which shall be resolved by expedited arbitration as set forth in Section 27.20.1 hereof, any dispute, claim, or controversy between Landlord and Tenant (and/or their officers, directors, employees, agents, or subsidiary or affiliated entities) arising out of or related to this Lease which cannot be resolved through a mediation in accordance with Section 27.20.2 above shall be adjudicated in the State or federal courts sitting in the county in which the Project is located.

27.20.4 JURY TRIAL WAIVER.   THE PARTIES HEREBY WAIVE TRIAL BY JURY IN ANY JUDICIAL PROCEEDING TO WHICH THEY (AND/OR THEIR OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, OR SUBSIDIARY OR AFFILIATED ENTITIES) ARE PARTIES THAT ARISES OUT OF OR RELATES TO THIS LEASE.

*[Signatures commence on the following page]*

IN WITNESS WHEREOF, Landlord and Tenant, acting herein through duly authorized individuals, have executed this Lease as of the date first above written.

**LANDLORD:**

284 HEXAGON LLC,
a Massachusetts limited liability company

By: _Sandra Edgerley_
    5982846E4A9B4A2...

Name: Sandra Edgerley

Title: President & Manager

**TENANT:**

SONDER HOSPITALITY USA INC.,
a Delaware corporation

By: _Rikesh Patel_
    0B0E6260623D4G3...

Name: Rikesh Patel

Title: Managing Director, Americas

## APPENDIX A

### DEFINITIONS

In addition to terms defined in the Basic Lease Information and in the body of this Lease, the following terms shall have the following meanings:

a)  **ADA:** The Americans with Disabilities Act (42 USC 12181 et seq., as amended from time to time.

b)  **Additional Rent:** Defined in Section 3.1.

c)  **Affiliate:** An entity which controls, is controlled by, or is under common control with Tenant.

d)  **Authorized Parties:** Tenant and its employees, agents, representatives, contractors, guests, customers, subtenants, and licensees.

e)  **Bond:** Any surety bond delivered by Tenant to Landlord as required pursuant to the terms of this Lease.

f)  **Bookings**: Any agreements and/or reservations for the use or occupancy of the Rooms or any other space within the Premises.

g)  **Brand Name:** Tenant's name and any other name containing "Sonder" used by Tenant.

h)  **Broker:** T3 Advisors.

i)  **Building Systems**: Collectively, all building systems including, without limitation, all structural systems, all building assemblies and components, all risers, landscape, sitework, stormwater, plumbing, mechanical systems & heating, ventilation and air-conditioning systems, electrical systems, elevators, boilers, utility lines, meters, fire and life-safety systems including the fire alarm, sprinkler main and fire escape.

j)  **Business License:** Any operating permits or licenses, business registrations, and/or other approvals specifically required by applicable Laws to be obtained by Tenant to operate the Permitted Use in or at the Premises, including the lodging house license.

k)  **Casualty:** Fire, flood, windstorm, earthquake, casualty, riots, civil unrest, or any other event beyond either party's reasonable control) making all or a portion of the Premises untenantable.

l)  **City:** The city in which the Premises is located.

m)  **Commencement Date Certificate:** Defined in Section 2.1.

n)   **Deep-Cleaned:** Collectively, (i) all carpet in the Premises are shampooed, (ii) all hard floors in the Premises are steam-cleaned, (iii) all walls and baseboards in the Premises are wiped down, (iv) the Premises are dusted, swept and mopped, (v) any appliances in the Premises are cleaned and wiped out, and (vi) all garbage in the Premises are properly disposed of.

o)   **Delivery Condition:** Collectively, (i) Landlord has delivered to Tenant vacant and exclusive possession of the Premises (except for Landlord's FF&E); (ii) the Premises are in structurally sound and watertight condition, Deep-Cleaned, free from Hazardous Materials, indoor mold growth and pests, and free from any non-compliance with applicable Laws (including, without limitation, ADA, local building code requirements, ordinances and Laws applicable to the Permitted Use) with all signage removed and any damage caused by such removal repaired; (iii) Tenant has confirmed the Premises are in good and satisfactory condition and working order (including, without limitation, all Building Systems); (iv) with Landlord's Work complete, including, without limitation, all Punchlist Items except for minor Punchlist Items that do not interfere with Tenant's Onboarding Work; (v) all approvals required for the use and occupancy of the Premises for the Permitted Use, including, without limitation, receipt of an unconditional certificate of occupancy or local equivalent, and the Permitted Use Approval, have been issued by the Governmental Authority and are in full force and effect; (vi) the Premises are ready for Tenant's Onboarding Access Period to commence, including, but not limited to, Tenant having access to and throughout the Premises; (vii) Landlord has delivered to Tenant a SNDA in accordance with Section 9.1 of this Lease, and (viii) Landlord's representations and warranties set forth in Section 23.1 of this Lease are true and correct.

p)   **Delivery Date:** The date Landlord delivers the Premises to Tenant with all of the Delivery Conditions satisfied.

q)   **Emergency**:  Any event, condition or occurrence that threatens imminent (a) damage or harm to persons or property, (b) violation of applicable Laws, or (c) imposition of fines or penalties.

r)   **Employment Laws:** Collectively, all federal, state, local and foreign statutes, laws, ordinances, regulations, rules, permits, judgments, orders and decrees affecting labor union activities, civil rights or employment in the United States, including, without limitation, the Civil Rights Act of 1870, 42 U.S.C. 1981, the Civil Rights Acts of 1871, 42 U.S.C. 1983 the Fair Labor Standards Act, 29 U.S.C. 201, et seq., the Civil Rights Act of 1964, 42 U.S.C.  2000e, et seq., as amended, the Age Discrimination in Employment Act of 1967, 29 U.S.C. 621, et seq., the Rehabilitation Act, 29 U.S.C.  701, et seq., the Worker Adjustment and Retraining Notification Act of 1988, the Americans With Disabilities Act of 1990, 29 U.S.C. 706, 42 U.S.C.  12101, et seq., the Employee Retirement Income Security Act of 1974, 29 U.S.C. 301, et seq., the Equal Pay Act, 29 U.S.C. 201, et seq., the National Labor Relations Act, 29 U.S.C. 151, et seq., and any regulations promulgated

pursuant to such statutes (collectively, as amended from time to time, and together with any similar laws now or hereafter enacted.

s) **Environmental Laws**:  Any and all federal, state and local health, safety, environmental or natural resource laws, statutes, rules, ordinances, codes, licenses, permits, orders, approvals, plans, authorizations, regulations, or similar items (whether now existing or hereafter enacted or promulgated) of all Governmental Authorities, having jurisdiction, and all other state, federal and local laws, regulations, rules, ordinances, and orders which govern: (i) the existence, cleanup and/or remedy of contamination on property; (ii) the emission or discharge of Hazardous Materials into the environment; (iii) the control of Hazardous Materials; (iv) the use, generation, transport, treatment, storage, disposal, removal, or recovery of Hazardous Materials; or (v) the safety and health of employees, any tenant, other user or invitee; as well as all applicable judicial and administrative and regulatory decrees, judgments or orders (including without limitation the "common law") and all applicable covenants running with the land that relate to the protection of health, safety, environment or natural resources, including, without limitation: (a) The Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended by The Superfund Amendments and Reauthorization Act of 1986; (b) The Resource Conservation and Recovery Act of 1976, as amended by The Used Oil Recycling Act of 1980; (c) The Solid Waste Disposal Act Amendment of 1980; (d) The Hazardous and Solid Waste Amendments of 1984; (e) The Hazardous Materials Transportation Act; (f) The Clean Water Act; (g) The Clean Air Act; (h) The Toxic Substances Control Act; (i) The Safe Drinking Water Act; (j) The Occupational Safety and Health Act; (k) The Federal Water Pollution Control Act; (l) The Federal Insecticide, Fungicide and Rodenticide Act; (m) The Georgia Hazardous Waste Management Act; and (n) The Georgia Hazardous Site Response Act.

t) **Event of Default**:  Defined in Section 20.1.

u) **Executive Order:** Defined in Section 27.16.

v) **Force Majeure Event**: Any force majeure event beyond Landlord's or Tenant's reasonable control, including, without limitation, acts of God, Casualty, strikes or labor troubles, riots and civil unrest, accident, acts of war, terrorism, bioterrorism (i.e., the release or threatened release of an airborne agent that may adversely affect the Premises or its occupants), governmental preemption in connection with an emergency, Laws, governmental delay, conditions of supply and demand of parts or materials, declaration by the World Health Organization of a pandemic, any applicable Laws imposing travel, quarantine, or shelter-in-place or similar restrictions, or any applicable Laws precluding, restricting, or impeding (or has the effect of precluding, restricting or impeding) Tenant's operation of the Premises (or preparation thereof) for the Permitted Use, or any other cause whatsoever, whether similar or dissimilar to the foregoing.

w)    **Governmental Authority**: Any government or authority having jurisdiction, whether federal, state, county, municipal, local or other, and any department, agency, entity or other body exercising executive, legislative, regulatory or administrative functions of government, including, without limitation, (a) the federal authorities of the United States of America, and the authorities of the State and the City, and (b) judicial and quasi-judicial authorities of any of the foregoing.

x)    **Hazardous Materials**: Collectively, any element or substance, (i) the presence of which requires investigation, reporting, removal or remediation under any Environmental Law, (ii) that is or becomes defined as a "hazardous waste," "hazardous substance," "hazardous material," "extremely hazardous substance," or other type of pollutant or contaminant under any applicable Environmental Law, (iii) that is toxic, reactive, explosive, corrosive, flammable, radioactive, carcinogenic, mutagenic, teratogenic, or otherwise hazardous and is or becomes regulated by any applicable Environmental Law, (iv) that is or contains oil, gasoline, diesel fuel, aviation fuel, or other petroleum hydrocarbons, products or derivatives, other than petroleum, crude oil, and petroleum products to the extent contained within regularly operated motor vehicles, (v) that is or contains PCBs, asbestos, radon or urea formaldehyde, (vi) that is fungi or bacterial matter which reproduces through the release of spores or the splitting of cells, including but not limited to, mold (including, without limitation, penicillium/aspergillus and stachybotrys chartarum), and Legionella (legionella pneumophila), (viii) the presence of which causes or threatens to cause a nuisance upon the Project or to adjacent property or poses or threatens to pose a hazard to the health or safety of any person, to plant or animal life, or to the environment, including, but not limited to sewage sludge, industrial slag, solvents and/or any other similar substances or materials.

y)    **Property Contracts**: All service contracts, maintenance contracts, licensing agreements, equipment leases and other contracts or agreements and any amendments thereto, with respect to the ownership, maintenance, operation, provisioning or equipping of the Project that are currently in effect.

z)    **Landlord**: Defined in Recitals.

aa)   **Landlord Party, and collectively, Landlord Parties:** Landlord and its directors, trustees, members, partners, officers, agents, representatives, property managers, contractors, and employees.

bb)   **Landlord's FF&E**:  Furniture, fixture, equipment, appliances and any other personal property of Landlord located on or used in the operation of the Project, as itemized in **Exhibit F** attached hereto.

cc)   **Landlord's Repair(s):** Defined in Section 7.1.

dd)   **Landlord's Services**: Defined in Section 6.1.

ee)  **Laws**:  All present and future laws, statutes, rules, regulations, orders, ordinances, judgments, notices, determinations, directives, guidelines, policies, restrictions, curfews, and other requirements of any Governmental Authority having jurisdiction, including, without limitation, Environmental Laws, Privacy Laws, fire and life safety regulations and seismic standards set forth by any Governmental Authority, and requirements of any Governmental Authority pertaining to accessibility, special needs and/or disability matters, including, but not limited to, the ADA or any equivalent state or local law or ordinance.

ff)  **Lease:** Defined in the Recitals.

gg)  **Lease Year**: A twelve (12) month period beginning on the Commencement Date or on each anniversary of the Commencement Date, provided, however, that if the Commencement Date does not fall on the first day of a calendar month, then the first Lease Year shall begin on the Commencement Date and end on the last day of the month containing the first anniversary of the Commencement Date, and each succeeding Lease Year shall begin on the day following the last day of the prior Lease Year.

hh)  **Licenses and Permits:**  Collectively, all licenses, permits, authorizations, approvals, registrations and certificates for the Project and lodging activities therein issued or required to be issued by any Governmental Authority, including, without limitation the certificate of occupancy for guesthouse use, elevator permit, boiler permit and pool permit.  For the avoidance of doubt, Licenses and Permits do not include the Business License.

ii)  **Losses**:  Any and all losses, liabilities, damages, claims, judgments, fines, suits, demands, costs, interest and expenses of any kind or nature (including reasonable attorneys' fees and disbursements).

jj)  **Mortgage:**  Any existing or future mortgage or deed of trust on the Building, including any modification, extension, supplement, consolidation and replacement thereof.

kk)  **Mortgagee:**  The holder of any Mortgage.

ll)  **Onboarding Work:**  Painting, applying wallpaper, bringing in, arranging and building furniture, placing and installing Tenant's Property and completing any other tasks necessary to prepare the Premises for Tenant's business.

mm)  **Other Rent:** All sums, other than the Base Rent and Additional Rent, payable by Tenant to Landlord under this Lease.  All Other Rent shall be separately invoiced by Landlord.

nn)  **Patriot Act:** Defined in Section 27.16.

oo)  **Permitted Use**:  Operation of a guesthouse and any related uses (including operation of a short-term/extended stay rentals) together with all uses customarily

related thereto, all as permitted by applicable Laws.  Service animals and emotional support animals shall be permitted on the Project and the Premises.

pp) **Permitted Use Approval:** Collectively, all permits, zoning approvals, licenses and/or other approvals necessary for the Permitted Use and for Tenant to obtain Business License, including, without limitation, construction related permits and licenses, temporary or permanent certificates of occupancy for the Project for guesthouse use.

qq) **Prevailing Market Rate:** Then-current RevPAR for guesthouse and hotels of similar age, size, condition, and location, and with similar amenities as the Premises.

rr) **Privacy Laws:** Any and all federal, state and local laws, statutes, rules, ordinances, codes, regulations, or similar items (whether now existing or hereafter enacted or promulgated) of all Governmental Authorities that apply to the processing of personal information or a party's representations regarding its personal information processing activities, including, without limitation, the California Consumer Privacy Act of 2018 (California Civil Code §§ 1798.100 to 1798.199) and its implementing regulations, and Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45).

ss) **Project**:  The real property described on **Exhibit A-1** attached to this Lease and together with all improvements thereon and appurtenances thereto, and all other related areas.

tt) **Proprietary Materials**: All trademarks, trade names, trade secrets, distinct emblems, insignia, logos, slogans, distinguishing characteristics, copyright materials (including, without limitation, written or recorded material related to marketing), software applications and data (whether in tangible, electronic or oral form), website URLs, central reservations systems, and information in written or tangible form that is indicated as being confidential or that from its nature or content would be understood by a reasonable person to be confidential, relating to Tenant or any of its affiliates, the business or affairs of Tenant or any of its affiliates, or any hotel or any rental property which Tenant or any of its affiliates owns or operates and manages (including all intellectual property connected with the Premises and developed or created by Tenant, or its affiliates, employees or agents) and including, without limitation, (i) Brand Name and Tenant Name, Tenant trade names and trademarks, (ii) operational manuals (including, without limitation, accounting, financial administration, personnel administration and policies and procedures manuals), (iii) corporate records of Tenant, (iv) software and other management programs developed by or on behalf of Tenant, notwithstanding any modification or alteration made for application at the Premises, (v) the operating and design standards of any hotel or rental property leased or operated by Tenant or any of its Affiliates and any materials relating thereto, (vi) business and marketing plans developed by Tenant, (vii) revenue management and forecasting data developed by Tenant and (viii) research, product plans, products, services,

equipment, customers, markets, software, inventions, discoveries, ideas, processes, designs, drawings, hardware, formulations, specifications, product configuration information, prototypes, samples, data sets, equipment and all of Tenant's financial information, including finance documents.

uu)  **Punchlist Items**:  Minor details of construction and mechanical adjustments that do not interfere with Tenant's onboarding, use or operation of the Premises.

vv)  **Renewal Notice:** Defined in Section 2.2.

ww)  **Rent:**  Collectively, Base Rent, Additional Rent, and all Other Rent.

xx)  **Rent Commencement Date:**  The date that is the day following the expiration of the Rent Abatement Period.

yy)  **Restoration:** Repairing and restoring the Premises, the Building and/or the Project (as applicable) to substantially the same condition that existed prior to a Casualty or Taking.

zz)  **Retained Liabilities:** Collectively, all liabilities and obligations in connection with any Losses to the extent resulting from events or occurrences prior to the Commencement Date or arising out of or related to ownership or operation of the Premises or Project prior to the Commencement Date.

aaa)  **Room(s):**  Each individual guest rooms comprising a part of the Premises.

bbb)  **Service Interruption:** an interruption to or material reduction of, failure to perform any, or any matter or condition that constitutes an interruption to, Landlord's Services that is caused by negligence or willful misconduct of a Landlord Party.

ccc)  **SNDA:**  A subordination, non-disturbance and attornment agreement.

ddd)  **State:**  The state in which the Premises is located.

eee)  **Taking:**  A taking by condemnation, eminent domain or similar legal action of a Governmental Authority.

fff)  **Tenant:** Defined in the Recitals.

ggg)  **Building Name**:  Collectively, the Brand Name (whether used alone or with other words), and all other names, logos or designs owned by Tenant or its Affiliates and used in operation of the Premises, together with the goodwill appurtenant thereto.

hhh)  **Tenant Lender:**  Any lender from which Tenant obtains financing.

iii)  **Tenant Party, and collectively, Tenant Parties**:  Tenant, and its directors, trustees, members, partners, officers, agents, representatives and employees.

DocuSign Envelope ID: BEC36B8A-8E20-44BC-B5C3-D639CF203491

jjj)     **Tenant's Plans:** Plans and specifications for Tenant's Work in form reasonably satisfactory to Landlord.

kkk)    **Tenant's Property:** Tenant's trade fixtures, equipment and personal property.

lll)     **Tenant's Work:** Alterations or improvements to the Premises, the Project or any part thereof performed by Tenant during the Term.

mmm)  **Termination Date:** The date upon which the Lease is terminated by either party hereto pursuant to the express terms of the Lease.

nnn)    **Transfer:** Any assignment of this Lease or subletting of all or any part of the Premises.

ooo)    **Utilities:** Defined in Section 6.3.

ppp)    **Utilities Interruption:** an interruption to or material reduction of Utilities caused by Landlord's negligence or willful misconduct.

qqq)    **Works:** Images, renderings, floorplans and other materials depicting the Project, including any high-resolution images.

## EXHIBIT A-1

## LEGAL DESCRIPTION OF THE PROJECT

A certain parcel of land with the buildings thereon situated in Boston, numbered 284 Commonwealth Avenue, in the County of Suffolk, Commonwealth of Massachusetts, bounded and described as follows:

| | |
|---|---|
| NORTHERLY | by Commonwealth Avenue, Twenty-seven (27) feet; |
| EASTERLY | by Gloucester Street, One Hundred Twenty-four and 5/10ths (124.5) feet; |
| SOUTHERLY | by a passageway sixteen (16) feet wide, Twenty-seven (27) feet; And |
| WESTERLY | by a line parallel with and 27 feet Westerly from the Westerly line of Gloucester Street, One Hundred Twenty-four and 5/10ths (124.5) feet. |

Also the fee and soil of so much of said passageway as lies Northerly of its center line and between the Easterly and Westerly side lines of granted premises extended Southerly subject to its use as a street or passageway by all persons entitled.

Subject to the provisions of an Agreement recorded in the Suffolk Registry of Deeds in Book 1420, Page 282, and a Party Wall Agreement recorded in Suffolk Deeds in Book 1565, Page 467.

Being shown as Lot 1 on a plan made by Fuller & Whitney, Civil Engineers and Surveyors, dated March 30, 1880, recorded with Suffolk Deeds Record Book 1525, Page 164.

**EXHIBIT A-2**

**DESCRIPTION OF THE PREMISES**

(see attached)

DocuSign Envelope ID: BEC36B8A-8E20-41BC-BEC3-D630CF203101



BASEMENT FLOOR PLAN
SCALE: 1/8" = 1'-0"

GROUND FLOOR PLAN
SCALE: 1/8" = 1'-0"

GLOUCESTER STREET

PUBLIC ALLEY

284 COMMONWEALTH
BASEMENT AND GROUND FLOOR PLAN

A1

GRASSI DESIGN GROUP

DocuSign Envelope ID: BEC36B8A-8E20-41BC-BEC3-D630CF203101



FIRST FLOOR PLAN
¼" = 1'-0"

SECOND FLOOR PLAN
¼" = 1'-0"

284 COMMONWEALTH

FIRST AND SECOND
FLOOR PLAN

A2

DocuSign Envelope ID: BEC36B8A-8E20-41BC-BEC3-D630CF203101



THIRD FLOOR PLAN
¼" = 1'-0"

FOURTH FLOOR PLAN
¼" = 1'-0"

THIRD AND FOURTH
FLOOR PLAN

284 COMMONWEALTH

A3

GRASSI DESIGN GROUP

A4
ROOF PLAN AND ELEVATIONS @ PROPOSED MEZZANINE
284 COMMONWEALTH
GRASSI DESIGN GROUP
46 Waltham Street, Suite 3A
Boston, MA 02118
ROOF PLAN @ MEZZANINE
1/4" = 1'-0"
ROOF PLAN
1/4" = 1'-0"
SOUTH ELEVATION @ MEZZANINE
SCALE: 1/4" = 1'-0"
EAST ELEVATION @ MEZZANINE
SCALE: 1/4" = 1'-0"
WEST ELEVATION @ MEZZANINE
SCALE: 1/4" = 1'-0"
NORTH ELEVATION @ MEZZANINE
SCALE: 1/4" = 1'-0"

DocuSign Envelope ID: BEC36B8A-8E20-41BC-BEC3-D630CF203101

## Exhibit A

### Legal Description of Property

(to be inserted)

# EXHIBIT B

# RENT ROLL

|          | Year 1    | Year 2      | Year 3      | Year 4      | Year 5      |
|----------|-----------|-------------|-------------|-------------|-------------|
| Month 1  | $0        | $87,090     | $92,751     | $95,070     | $97,446     |
| Month 2  | $36,288   | $87,090     | $92,751     | $95,070     | $97,446     |
| Month 3  | $72,575   | $87,090     | $92,751     | $95,070     | $97,446     |
| Month 4  | $72,575   | $87,090     | $92,751     | $95,070     | $97,446     |
| Month 5  | $72,575   | $87,090     | $92,751     | $95,070     | $97,446     |
| Month 6  | $72,575   | $87,090     | $92,751     | $95,070     | $97,446     |
| Month 7  | $72,575   | $87,090     | $92,751     | $95,070     | $97,446     |
| Month 8  | $72,575   | $87,090     | $92,751     | $95,070     | $97,446     |
| Month 9  | $72,575   | $87,090     | $92,751     | $95,070     | $97,446     |
| Month 10 | $72,575   | $87,090     | $92,751     | $95,070     | $97,446     |
| Month 11 | $72,575   | $87,090     | $92,751     | $95,070     | $97,446     |
| Month 12 | $72,575   | $87,090     | $92,751     | $95,070     | $97,446     |
| Annual   | $870,900  | $1,045,080  | $1,113,010  | $1,140,835  | $1,169,356  |

**EXHIBIT C-1**

**LANDLORD'S WORK**

- Exterior Door Approaches: Main entry door pull-side maneuvering clearance does not provide 18" of clearance on the latch pull side of the door. The stone that wraps the opening impedes the area and measures greater than the 8" maximum depth allowed. Install an automatic door opener/actuator outside of the swing of the door. Ensure a 30"x48" clear floor area is provided centered on the controls.

**EXHIBIT C-2**

**INITIAL TENANT WORK**

1.      Replace (E) Sconces w/ (N) Scones (post-removal of (E) decorative tile wall treatment- all guest room units

2.      Replace (E) surface mounted ceiling light fixture w/ (N) Light fixture - all guest room units

3.      Remove (E) curtains and valances and replace w/ (N) Blackout curtains and curtain rods (keep (E) window shades) - all guest room units, hallways & common areas

4.      Paint all guest room kitchenette cabinets & replace (E) cabinet hardware w/ (N) hardware - all guest rooms that have kitchenettes

5.      Replace (E) microwaves & refrigerators w/ (N) SS microwaves & refrigerators - all guest rooms that have kitchenettes

**EXHIBIT D**

**FORM COMMENCEMENT DATE CERTIFICATE**

<u>**COMMENCEMENT DATE CERTIFICATE**</u>

This Commencement Date Certificate (this "**Certificate**") is entered into this _____ day of _____, 20__, by and between [_____], a [_____] ("**Landlord**") and Sonder Hospitality USA Inc., a Delaware corporation ("**Tenant**"), who declare the following:

Recitals:

A.  Landlord and Tenant have entered into that certain Lease Agreement, dated _____, 20____ ("**Lease**") for the Premises located at [_____], and,

B.  Landlord and Tenant now wish to set forth their agreements as to certain key dates during the Term of this Lease.  Capitalized terms used but not defined herein shall have the meanings set forth in the Lease.

Agreement:

In consideration of the mutual promises and covenants set forth in the Lease, Landlord and Tenant agree as follows:

1.  The Delivery Date  occurred on _____, 20____.

2.  The Commencement Date occurred on _____ ____, 20____ (the "**Commencement Date**").

3.  The Rent payments shall commence _____ ____, 20____ .  The Rent amounts and payment dates during the Initial Term of the Lease shall be set forth on <u>Exhibit "A"</u> attached hereto.

4.  The Expiration Date of the Initial Term shall be _____, 20____, unless sooner terminated or extended in accordance with the Lease.

5.  The date by which the [First Renewal Option] must be exercised is no earlier than _____ ____, 20____ and no later than _____ ____, 20___.

*[Signature Page Follows]*

The parties hereto have executed this Certificate as of the day and year first written above.

LANDLORD:

[_____],

a [_____]

By: _____ _____

    Name:_____

    Title:_____

TENANT:

SONDER HOSPITALITY USA INC.,

a Delaware corporation

By: _____ _____

    Name:_____

    Title:_____

**Exhibit "A"**

**Rent Payment Schedule**

# EXHIBIT E

# MEMORANDUM OF LEASE

THIS MEMORANDUM OF LEASE (this "**Memorandum**") is executed as of _____, 20__, by and between [_____], a [_____] ("**Landlord**"), and **SONDER HOSPITALITY USA INC.**, a Delaware corporation ("**Tenant**").

# W I T N E S S E T H:

WHEREAS, Landlord and Tenant entered into a Lease Agreement, dated the same date herewith (the "**Lease**"), pursuant to which Landlord leases to Tenant certain premises more fully described in the Lease (the "**Premises**") in the property located at [_____] (as described in Exhibit A attached hereto, the "**Property**"), for an initial Term of [_____] ([_____]) years; and

WHEREAS, Landlord and Tenant have executed this Memorandum to provide third parties with notice of the existence of the Lease.

NOW THEREFORE, in consideration of the sum of One Dollar ($1.00) and other good and valuable consideration paid by Tenant to Landlord, the receipt and sufficiency of which are hereby acknowledged, the parties to this Memorandum agree as follows:

1.   Recitals.  The recitals above are incorporated by reference into this paragraph as if set forth in full.

2.   Notice of Lease.  Landlord and Tenant agree that this Memorandum is intended to provide notice to third parties of the existence of the Lease.  This Memorandum is not a complete summary of the Lease, and shall not amend or modify the Lease.  In the event of a conflict between the terms of this Memorandum and the terms of the Lease, the terms of the Lease shall control.  Upon the expiration or earlier termination of the term of the Lease, this Memorandum shall automatically terminate, and Landlord shall be entitled to record a notice of termination on its own signature. Landlord shall be deemed to be Tenant's attorney-in-fact (which power of attorney shall be irrevocable and coupled with an interest) for the sole purpose of executing and recording such termination notice.

3.   Applicable Law.  This Memorandum shall be interpreted in accordance with the laws of the State of [_____] (without regard to principles of conflicts of laws). Neither the rule against perpetuities nor any similar law of the State of [_____] shall apply to this Memorandum or the Lease.

**The foregoing is a summary of certain terms of the Lease for purposes of giving notice thereof, and shall not be deemed to modify or amend the terms of the Lease.**

[remainder of page intentionally left blank]

IN WITNESS WHEREOF, Landlord and Tenant have executed this Memorandum of Lease as of the date and year first above written.

**LANDLORD**:

[_____],
a [_____]

By: _____   _____
     Name:_____
     Title:_____

STATE OF                    )
COUNTY OF             ) ss:

       I, _____, a Notary Public in and for the jurisdiction aforesaid do hereby certify that _____, who is personally well known to me as the _____ of _____, Landlord in the foregoing Memorandum of Lease, personally appeared before me in said jurisdiction and acknowledged the same to be his act and deed in his aforesaid capacity for the purpose therein contained.

       GIVEN under my hand and notarial seal this _____ day of _____, 20__.

                        _____
                        Notary Public
My Commission Expires:

[SIGNATURES CONTINUE ON FOLLOWING PAGE]

**TENANT**:

**SONDER HOSPITALITY USA INC.**,
a Delaware corporation

By:    _____
       Name:
       Title:

STATE OF                          )
COUNTY OF                         )  ss:

       I, _____, a Notary Public in and for the jurisdiction aforesaid do hereby certify that _____, who is personally well known to me as the _____ of **SONDER HOSPITALITY USA INC.**, the Tenant in the foregoing Memorandum of Lease, personally appeared before me in said jurisdiction and acknowledged the same to be his act and deed in his aforesaid capacity for the purpose therein contained.

       GIVEN under my hand and notarial seal this _____ day of _____, 20___.


       _____
       Notary Public

My Commission Expires:

## Exhibit A

**Legal Description of Property**

(to be inserted)

**EXHIBIT F**

**LANDLORD'S FF&E**

(see attached)

| | | | | | |
|---|---|---|---|---|---|
| **No 284 / 284 Hexagon LLC** | | | | | |
| **Personal Property Listing - April 28, 2021** | | | | | |

| Vendor | Item | Class | Price per unit | # of Pieces | Total Price |
|---|---|---|---|---|---|
| Hexagon | Appliances | Appliances | 475.98 | 75 | 35,698.29 |
| | | **Appliances Total** | | 75 | 35,698.29 |
| Sharon | Custom Bed Headboard & Frame | Bed | 2,443.00 | - | 2,443.00 |
| Sharon | King Bed Fabric (100% due now) | Bed | 767.20 | - | 2,301.60 |
| Sharon | King Mattress Set | Bed | 954.00 | 3 | 2,862.00 |
| Sharon | Queen Bd Fabric (100% due now) | Bed | 630.00 | - | 12,600.00 |
| Sharon | Queen Mattress Set | Bed | 804.00 | 20 | 16,080.00 |
| Sharon | Queen Serta Bellagio Mattress & Box Spring | Bed | 899.99 | - | 899.99 |
| | | **Bed Total** | | 23 | 37,186.59 |
| Sharon | Chairs Fabric (100% due now) | Chair | 44.80 | 8 | 358.40 |
| Sharon | Credit for Brass Greek Key Chairs purchased but not used | Chair | 779.00 | (4) | (3,116.00) |
| Sharon | Custom Swivel Barrel Chair | Chair | 1,062.00 | 1 | 1,062.00 |
| Sharon | Dining /Desk chairs Fabric (100% due now) | Chair | 73.92 | 21 | 1,552.32 |
| Sharon | Gold Chair with Velvet Teal Blue Seat | Chair | 723.64 | 1 | 723.64 |
| Sharon | Gray Club Chair for Library | Chair | 2,096.00 | 1 | 2,096.00 |
| Sharon | Library Banquettes Fabric | Chair | 571.20 | 1 | 571.20 |
| Sharon | Library Upholstered Club Chairs with Lumbars** | Chair | 2,096.00 | 2 | 4,192.00 |
| Sharon | Office Large Upholstered Club Chairs** | Chair | 2,149.00 | 2 | 4,298.00 |
| Sharon | Swivel Chairs Fabric (100% due now) | Chair | 380.80 | 16 | 6,092.80 |
| Sharon | Swivel Chairs Fabric (100% due now) | Chair | 380.80 | 1 | 380.80 |
| Sharon | Swivel Tilt Executive Chair, Channeled Back in Gray Leather | Chair | 4,500.00 | 1 | 4,500.00 |
| Sharon | Swivel Tilt Executive Chair, Vertical Upholstered Stripes in Gray Leather | Chair | 3,645.00 | 1 | 3,645.00 |
| | | **Chair Total** | | 52 | 26,356.16 |
| Hexagon | Coffee Machine | Coffee Machine | 6,042.28 | 1 | 6,042.28 |
| | | **Coffee Machine Total** | | 1 | 6,042.28 |
| Sharon | Loveseat/Sleeper Sofa for Suites** | Couch | 4,318.00 | 3 | 12,954.00 |
| | | **Couch Total** | | 3 | 12,954.00 |
| Sharon | A & B Home Wellington Desk | Desk | 299.97 | 1 | 299.97 |
| | | **Desk Total** | | 1 | 299.97 |
| Sharon | Desk Chair Fabric (100% due now) | Chair | 505.40 | 13 | 6,570.20 |
| Sharon | Desks / Dining Fabric (100% due now) | Chair | 73.92 | 13 | 960.96 |
| | | **Chair Total** | | 26 | 7,531.16 |
| Sharon | Executive Pedestal Desks | Desk | 5,985.00 | 2 | 11,970.00 |
| Sharon | Guest Room Writing Desks | Desk | 560.00 | 23 | 12,880.00 |
| | | **Desk Total** | | 25 | 24,850.00 |
| Sharon | Brushed Nickel Desk Lamps | Lamp | 109.99 | 13 | 1,429.86 |
| Sharon | Credit for Square Linen Lamp Shades | Lamp | 62.50 | | (250.00) |
| Sharon | Floor Lamps | Lamp | 475.64 | 11 | 5,232.00 |
| Sharon | Lamps | Lamp | 129.99 | 2 | 259.98 |
| Sharon | Office Desk Lamps | Lamp | 735.09 | 2 | 1,470.18 |
| Sharon | Replacement Crystal Ceiling Light | Lamp | 299.99 | 1 | 299.99 |
| Sharon | Square Linen Lamp Shades | Lamp | 62.50 | | 250.00 |
| Sharon | Standing Floor Lamps | Lamp | 459.20 | 27 | 12,398.40 |
| Sharon | Table Lamps for Penthouse Suite | Lamp | 491.99 | 2 | 983.98 |
| | | **Lamp Total** | | 58 | 22,074.38 |
| Sharon | Entry Mirrors (includes installation) | Mirror | 192.00 | 6 | 1,152.00 |
| Sharon | Large Mirror | Mirror | 548.90 | 1 | 548.90 |
| | | **Mirror Total** | | 7 | 1,700.90 |
| Sharon | Night Stands | Night Stand | 349.99 | 2 | 699.98 |
| Sharon | Night Stands | Night Stand | 419.98 | 48 | 20,159.04 |
| | | **Night Stand Total** | | 50 | 20,859.02 |
| Sharon | Ottoman Fabric (100% due now) | Ottoman | 95.20 | 4 | 380.80 |
| | | **Ottoman Total** | | 4 | 380.80 |
| Sharon | Outdoor Chaise Lounge | Outdoor Furniture | 2,278.80 | 2 | 4,557.60 |
| Sharon | Outdoor Dining Chair | Outdoor Furniture | 478.80 | 12 | 5,745.60 |
| Sharon | Outdoor Dining Table | Outdoor Furniture | 478.80 | 3 | 1,436.40 |
| Sharon | Outdoor End Table | Outdoor Furniture | 490.80 | 7 | 3,435.60 |
| Sharon | Outdoor Lounge Chair | Outdoor Furniture | 1,078.80 | 2 | 2,157.60 |
| Sharon | Outdoor Sofa | Outdoor Furniture | 1,438.80 | 2 | 2,877.60 |
| | | **Outdoor Furniture Total** | | 28 | 20,210.40 |
| Harbor Networks | Master Phone | Phone | 6,950.00 | 1 | 6,950.00 |
| Harbor Networks | Modem | Phone | 2,495.00 | - | 2,495.00 |
| Harbor Networks | Phone | Phone | 159.20 | 2 | 318.40 |
| Harbor Networks | Phones | Phone | 343.20 | 2 | 686.40 |
| Harbor Networks | Phones | Phone | 144.66 | 21 | 3,037.86 |

| | | | | |
|---|---|---|---|---|
| Harbor Networks | Server | Phone | 4,000.00 | - | 4,000.00 |
| Harbor Networks | Switch | Phone | 1,866.40 | - | 1,866.40 |
| Harbor Networks | Wireless phone | Phone | 479.20 | 1 | 479.20 |
| | | **Phone Total** | | 27 | 19,833.26 |
| Sharon | Magazine Rack | Rack | 178.80 | 1 | 178.80 |
| | | **Rack Total** | | 1 | 178.80 |
| Maverick | Amp | Security | 591.79 | 3 | 1,775.37 |
| Maverick | Camera Licenses | Security | 140.47 | 24 | 3,371.36 |
| Maverick | Camera Monitor | Security | 350.69 | 1 | 350.69 |
| Maverick | Camera Power Supply | Security | 1,280.59 | 2 | 2,561.18 |
| Maverick | Camera Recorder | Security | 4,730.43 | 1 | 4,730.43 |
| Maverick | Network Accessories | Security | 207.78 | 1 | 207.78 |
| Maverick | Network Accessories | Security | 301.23 | 2 | 602.45 |
| Maverick | Network Frame | Security | 1,588.06 | 2 | 3,176.12 |
| Maverick | Panel Power Distribution | Security | 332.55 | 2 | 665.10 |
| Maverick | Panel UPS | Security | 336.63 | 2 | 673.26 |
| Maverick | Patch Panel | Security | 377.79 | 7 | 2,644.51 |
| Maverick | Speaker | Security | 706.91 | 1 | 706.91 |
| Maverick | Video Balun | Security | 1,053.37 | 1 | 1,053.37 |
| Maverick | Video Cameras | Security | 968.95 | 21 | 20,348.04 |
| Maverick | Video Cameras | Security | 1,394.02 | 3 | 4,182.07 |
| | | **Security Total** | | 73 | 47,048.64 |
| Sharon | Blue Mosaic Table | Table | 495.00 | 1 | 495.00 |
| Sharon | Blue Mosaic Table | Table | 495.00 | (1) | (495.00) |
| Sharon | Chrome and Marble C-Tables | Table | 521.88 | 11 | 5,740.68 |
| Sharon | Chrome Console Table | Table | 598.80 | 2 | 1,197.60 |
| Sharon | Clear Table Top Glass | Table | 226.80 | 1 | 226.80 |
| Sharon | Cocktail Tables | Table | 935.99 | 3 | 2,807.96 |
| Sharon | Hex Side Table | Table | 214.80 | 1 | 214.80 |
| Sharon | Hexagon Side Tables | Table | 214.80 | 19 | 4,081.20 |
| Sharon | Library Tables | Table | 603.00 | 6 | 3,618.00 |
| Sharon | Metal and Carrera Marble Console Table | Table | 658.80 | 1 | 658.80 |
| Sharon | Round Dining Tables for Suites | Table | 590.00 | 4 | 2,360.00 |
| | | **Table Total** | | 48 | 20,905.84 |
| Hexagon | TVs charged back from Hexagon | TV | 436.04 | 23 | 10,028.94 |
| | | **TV Total** | | 23 | 10,028.94 |
| | | | | 525 | 314,139.44 |
| | Dumpster | | | 1 | 6,500.00 |
| | | **Grand Total** | | | 320,639.44 |

DocuSign Envelope ID: BEC36B8A-8E20-41BC-BEC3-D630CF203101

# EXHIBIT G

## SCHEDULE OF SERVICES

| Category | Frequency | Responsible Party |
|---|---|---|
| Battery replacement of smoke detectors | 2x a year | Tenant at Landlord Expense |
| Service HVAC Filters (in the Premises) | 2x per year | Landlord at Landlord Expense |
| Service of HVAC Filters (outside the Premises) | 2x per year | Landlord at Landlord Expense |
| Replacement of light bulbs for Non-Wired (Plug-in) Lighting (outside the Premises) | As necessary | Tenant at Tenant Expense |
| Replacement of light bulbs for Non-Wired (Plug-in) Lighting (in the Premises) | As necessary | Tenant at Tenant Expense |
| Replacement of light bulbs for Hard Wired Lighting | As necessary | Tenant at Tenant Expense |
| Battery replacement of unit door access control (Door handle/lock) | 1x per year | Landlord at Landlord Expense |
| Cleaning Service (in the Premises) | As necessary | Tenant at Tenant Expense |
| Cleaning Service (outside the Premises) | As necessary | Landlord at Landlord Expense |
| Life Safety, Fire Detection, and Alarm Inspection & Testing | Statutory | Landlord at Landlord Expense |
| Trash Removal | As necessary | Landlord at Landlord Expense |
| Recycling | As necessary | Landlord at Landlord Expense |
| Pest Control | As necessary | Landlord at Landlord Expense |
| Bed Bugs | As necessary | Tenant at Tenant Expense |
| Exterior Window Cleaning | 4x per year | Landlord at Landlord Expense |
| Landscaping | As necessary | Landlord at Landlord Expense |
| Snow and Ice Removal | As necessary | Landlord at Landlord Expense |

Notes:
Landlord at Landlord expense: LL performs the work and pays for it
Landlord at Tenant expense: LL performs the work, and Sonder pays
Tenant at Landlord expense: Sonder performs the work, and LL pays
Tenant at Tenant expense: Tenant performs the work and pays for it
* Executing Tenant at Tenant expense does NOT negate LL's general
obligation to repair, maintain and replace building systems

Boston – 248 Commonwealth Ave – Lease Exhibit G

## **EXHIBIT K**

**APPROVED VENDOR LIST**

(to be attached)

DocuSign Envelope ID: BEC36B8A-8E20-41BC-BEC3-D630CF203101

**EXHIBIT G**

**SCHEDULE OF SERVICES**

| Category | Frequency | Responsible Party |
|---|---|---|
| Battery replacement of smoke detectors | 2x a year | Tenant at Landlord Expense |
| Service HVAC Filters (in the Premises) | 2x per year | Landlord at Landlord Expense |
| Service of HVAC Filters (outside the Premises) | 2x per year | Landlord at Landlord Expense |
| Replacement of light bulbs for Non-Wired (Plug-in) Lighting (outside the Premises) | As necessary | Tenant at Tenant Expense |
| Replacement of light bulbs for Non-Wired (Plug-in) Lighting (in the Premises) | As necessary | Tenant at Tenant Expense |
| Replacement of light bulbs for Hard Wired Lighting | As necessary | Tenant at Tenant Expense |
| Battery replacement of unit door access control (Door handle/lock) | 1x per year | Landlord at Landlord Expense |
| Cleaning Service (in the Premises) | As necessary | Tenant at Tenant Expense |
| Cleaning Service (outside the Premises) | As necessary | Landlord at Landlord Expense |
| Life Safety, Fire Detection, and Alarm Inspection & Testing | Statutory | Landlord at Landlord Expense |
| Trash Removal | As necessary | Landlord at Landlord Expense |
| Recycling | As necessary | Landlord at Landlord Expense |
| Pest Control | As necessary | Landlord at Landlord Expense |
| Bed Bugs | As necessary | Tenant at Tenant Expense |
| Exterior Window Cleaning | 4x per year | Landlord at Landlord Expense |
| Landscaping | As necessary | Landlord at Landlord Expense |
| Snow and Ice Removal | As necessary | Landlord at Landlord Expense |

Notes:
Landlord at Landlord expense: LL performs the work and pays for it
Landlord at Tenant expense: LL performs the work, and Sonder pays
Tenant at Landlord expense:  Sonder performs the work, and LL pays
Tenant at Tenant expense: Tenant performs the work and pays for it
* Executing Tenant at Tenant expense does NOT negate LL's general
obligation to repair, maintain and replace building systems

Boston – 248 Commonwealth Ave – Lease Exhibit G
3686971.v13

# EXHIBIT H

# FORM OF BOND

## LEASE BOND

_____Insurance Company

_____

Bond No. _____

KNOW ALL BY THESE PRESENTS, that we SONDER HOSPITALITY USA INC., as Principal, and

INSURANCE COMPANY, a corporation organized and existing under the laws of the State of_____,authorized to do business in the State of_____, as Surety, are held and firmly bound unto _____, as Obligee, in the penal sum of: _____($_____._), lawful money of the United States of America, to be paid to the said Obligee, or their successors or assignees, for which payment well and truly to be made, we, and each of us do hereby bind ourselves, and each of our heirs, executors, administrators, successors and assigns, jointly and severally, firmly by these presents.

WHEREAS, the Principal has entered into a certain lease with the Obligee for the premises located at _____, all as per the terms and conditions of said lease, and is required by said Obligee to give this Lease Bond as financial security for any accrued unpaid Lease obligations of the Principal to the Obligee.

NOW, THEREFORE, the condition of this obligation is such that if the Principal shall comply with the terms of the lease and save harmless the Obligee from any loss or damage, then this obligation is void, otherwise to remain in full force and effect.

Provided, however, that this Lease Bond is executed by the said Principal and the said Surety and accepted by the said Obligee upon the following express conditions:

1.   The liability of the Surety on this Lease Bond shall not exceed the sum of ($_____._) in the aggregate.

2.    In the event of any default of the Principal herein, the Surety shall be given written notice by the Obligee of such default within Twenty (20) days after such default by certified mail to the Surety at its office at:

3.    Within thirty (30) days of Surety's receipt of a default under this Lease Bond, Surety shall pay to theObligee the amount of such default.

4.    It is further understood that this Lease Bond may be canceled at any time by the Surety upon givingninety (90) days' notice by certified mail, to the Obligee in which event the liability of the Surety shallterminate at the expiration of ninety (90) days except to any liability that may have arrived prior to the expiration of the ninety (90) days.

5.    No action or suit or proceeding either at law or in equity shall be maintained against the Surety unless such action, suit or proceeding is commenced within three (3) months after the termination of this bond.

This Lease Bond is to be effective _____

Signed and Sealed this day of _____, 202_.

SONDER HOSPITALITY USA INC. (Principal)      INSURANCE COMPANY (Surety)

By:_____                By:_____
Name:_____              Name:_____
Title:_____             Title:_____

# EXHIBIT I

# ADDITIONAL RENT

| Month | Monthly Payment Amount | Full Payment Amount |
|---|---|---|
| 1 | $920.83 | $49,245.84 |
| 2 | $920.83 | $48,489.17 |
| 3 | $920.83 | $47,729.97 |
| 4 | $920.83 | $46,968.25 |
| 5 | $920.83 | $46,203.98 |
| 6 | $920.83 | $45,437.17 |
| 7 | $920.83 | $44,667.80 |
| 8 | $920.83 | $43,895.87 |
| 9 | $920.83 | $43,121.36 |
| 10 | $920.83 | $42,344.27 |
| 11 | $920.83 | $41,564.59 |
| 12 | $920.83 | $40,782.31 |
| 13 | $920.83 | $39,997.43 |
| 14 | $920.83 | $39,209.93 |
| 15 | $920.83 | $38,419.80 |
| 16 | $920.83 | $37,627.04 |
| 17 | $920.83 | $36,831.64 |
| 18 | $920.83 | $36,033.58 |
| 19 | $920.83 | $35,232.87 |
| 20 | $920.83 | $34,429.49 |
| 21 | $920.83 | $33,623.43 |
| 22 | $920.83 | $32,814.68 |
| 23 | $920.83 | $32,003.23 |
| 24 | $920.83 | $31,189.09 |
| 25 | $920.83 | $30,372.22 |
| 26 | $920.83 | $29,552.64 |
| 27 | $920.83 | $28,730.32 |
| 28 | $920.83 | $27,905.26 |
| 29 | $920.83 | $27,077.45 |
| 30 | $920.83 | $26,246.89 |
| 31 | $920.83 | $25,413.55 |
| 32 | $920.83 | $24,577.44 |
| 33 | $920.83 | $23,738.53 |
| 34 | $920.83 | $22,896.84 |
| 35 | $920.83 | $22,052.33 |
| 36 | $920.83 | $21,205.01 |
| 37 | $920.83 | $20,354.87 |
| 38 | $920.83 | $19,501.90 |
| 39 | $920.83 | $18,646.08 |
| 40 | $920.83 | $17,787.40 |
| 41 | $920.83 | $16,925.87 |
| 42 | $920.83 | $16,061.46 |
| 43 | $920.83 | $15,194.17 |

DocuSign Envelope ID: BEC36B8A-8E20-44BC-85C3-D639CF203401

| 44 | $920.83 | $14,323.99 |
| 45 | $920.83 | $13,450.92 |
| 46 | $920.83 | $12,574.93 |
| 47 | $920.83 | $11,696.02 |
| 48 | $920.83 | $10,814.18 |
| 49 | $920.83 | $9,929.40 |
| 50 | $920.83 | $9,041.67 |
| 51 | $920.83 | $8,150.98 |
| 52 | $920.83 | $7,257.33 |
| 53 | $920.83 | $6,360.69 |
| 54 | $920.83 | $5,461.07 |
| 55 | $920.83 | $4,558.44 |
| 56 | $920.83 | $3,652.81 |
| 57 | $920.83 | $2,744.16 |
| 58 | $920.83 | $1,832.48 |
| 59 | $920.83 | $917.77 |
| 60 | $920.83 | $0.00 |





Boston – 248 Commonwealth Ave – Lease Exhibit J
3686971.v13

DocuSign Envelope ID: BEC36B8A-8E20-44BC-B5C3-D639CF203191



Boston – 248 Commonwealth Ave – Lease Exhibit J
3686971.v13



Boston – 248 Commonwealth Ave – Lease Exhibit K
3686971.v13